883 A.2d 537

**Jeffrey REIFSNYDER, Dennis Remp and Richard Hoffa**

v.

**WORKERS' COMPENSATION APPEAL BOARD (DANA CORPORATION),**

**Appeal of: Dana Corporation.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 2004.

Decided Sept. 28, 2005.

David S. Reno, Carol A. Crisci, Fort Washington, for Dana Corp.

Thomas Joseph O'Brien, Philadelphia, for Jeffrey Reifsnyder.

Amber Marie Kenger, Richard C. Lengler, Harrisburg, for Workers Compensation Appeal Board.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice CASTILLE.

In these three consolidated appeals, this Court is faced with the following question concerning the 1996 amendments to Section 309(d) of the Workers' Compensation Act (the "Act"), *see* 77 P.S. § 582(d): what constitutes the proper calculation of a claimant's average weekly wage ("AWW") for purposes of computing a workers' compensation benefit in the situation where the injured employee was subject to work-related lay-offs for business/economic reasons in the relevant look-back period? This Court has recently examined the proper calculation of a claimant's AWW under amended Section 309(d) in two cases involving materially distinct circumstances, but which are instructive in resolving the issue here. In *Hanna-berry HVAC v. Workers' Compensation Appeal Bd. (Snyder, Jr.)*, 575 Pa.66, 834 A.2d 524 (2003), we determined that the overall purpose of the 1996 amendments was to ensure an accurate calculation of an injured worker's average wages/earning capacity; and we held that the diminished wages the claimant in that case had earned as a part-time student worker were not to be included in calculating his AWW, where his disabling work injury occurred after he had graduated from high school and had been working for three months as a full-time employee. In the second matter, *Colpet-zer v. Workers' Compensation Appeal Bd. (Standard Steel)*, 870 A.2d 875 (Pa.2005), the injured claimants had received no wages during relevant periods in the prior year only because they were on disability as a result of prior compensated work injuries; this Court held that an accurate calculation of AWW in that instance required that the periods of prior disability not be treated as if the claimants had no earning capacity at that time, but instead, the AWW already established for the prior work injuries is the measure of the AWW for the relevant prior periods of disability.

In each of the matters *sub judice*, the Claimant/appellee was a long-term employee of appellant Dana Corporation: Claimants Jeffrey Reifsnyder and Richard Hoffa were em-

ployed for approximately nineteen years, and claimant Dennis Remp for approximately fifteen years. Each Claimant maintained a continuing employment relationship with Employer, pursuant to the terms of a collective bargaining agreement, but were subject to periodic layoffs during downturns in Employer's production cycle, including layoffs in each of the four quarters immediately preceding the work injury at issue. In each case, both the Workers' Compensation Judge ("WCJ") and the Workers' Compensation Appeal Board ("WCAB") construed the Act as requiring that the periods of time when Claimants earned no wages due to layoffs be included in the calculation of their AWW pursuant to Section 309(d), which provides for an averaging of the weekly wages earned in the highest three of four immediately preceding work quarters. Claimants appealed to the Commonwealth Court, which consolidated the appeals and then reversed, concluding that the layoffs resulted in Claimants working less than a single completed period of thirteen weeks in the previous year and that the AWW was to be calculated pursuant to subsection 309(d.2), which authorizes a prospective calculation of AWW measured by multiplying the worker's hourly wage rate by his expected weekly work hours. For the reasons that follow, we agree with the WCJ and the WCAB that Section 309(d) controls, and that the periods of time during which Claimants received no wages because of periodic layoffs must be included in the computation of AWW. Accordingly, we reverse the Commonwealth Court.

Section 309, as amended in 1996, sets forth a scheme for computing "the average weekly wages of the employe." 77 P.S. § 582. Sections 309(a), (b) and (c) provide the method of calculating AWW when the employee's wages are fixed by the week, month or year, respectively. None of those Sections is at issue here. Section 309(d) then describes various methods of calculating AWW where, as here, wages are fixed otherwise:

> (d) If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the average weekly wage shall be calculated by dividing by thirteen the

total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

(d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

(d.2) If the employe has worked less than a complete period of thirteen calendar weeks and does not have fixed weekly wages, the average weekly wage shall be the hourly wage rate multiplied by the number of hours the employe was expected to work per week under the terms of employment.

77 P.S. § 582.[1]

It is undisputed that each Claimant was entitled to workers' compensation benefits for injuries sustained while working for employer; the issue is the proper calculation of those benefits. The three cases proceeded before the WCJ upon stipulated facts. Due to recurring periodic layoffs in the previous year, none of the Claimants had continuous wage earnings for a complete thirteen-week period in the year preceding injury. In accordance with the terms of the collective bargaining agreement, Claimants maintained their plant seniority and Employer continued to provide them with healthcare benefits and contributions to their retirement accounts, notwithstanding the periodic layoffs. Because Employer considered each Claimant to be "in its employ" for four consecutive periods of 13 calendar weeks in the 52 weeks immediately preceding injury, Employer calculated the AWW pursuant to Section 309(d).

1. Section 309(e) addresses AWW calculations for seasonal employees, and thus is not directly relevant here. (The last paragraph of Section 309(e) also addresses concurrent employment scenarios.)

Claimants filed petitions for review, arguing that the AWW should have been calculated under the prospective, hourly multiplier set forth in subsection 309(d.2). On September 12, 2000, the WCJ issued separate but consistent decisions and orders, noting that, although Claimants did not earn wages for any single consecutive period of 13 calendar weeks in the year preceding their injuries because of the work layoffs, they nevertheless continued in an employment relationship with Employer the whole time, including the periods during which they were laid off. Accordingly, in the WCJ's view, Employer properly calculated Claimants' AWW pursuant to Section 309(d). Claimants appealed to the WCAB, which affirmed the WCJ in each case, employing similar reasoning in separate but materially identical opinions.

Upon further appeal by Claimants, a panel of the Commonwealth Court reversed and remanded in a published opinion. *Reifsnyder v. Workers' Compensation Appeal Bd. (Dana Corp.)*, 826 A.2d 16 (Pa.Cmwlth.2003). Citing that court's earlier decision in *Bethlehem Structural Products v. Workers' Compensation Appeal Bd. (Vernon)*, 789 A.2d 767 (Pa. Cmwlth.2001), *appeal denied*, 568 Pa. 706, 796 A.2d 986 (2002), the panel first found that, in determining whether Section 309(d) or subsection 309(d.2) applied, the controlling issue was whether Claimants actually "worked" during the pertinent periods and not whether claimants maintained an employment relationship with Employer. The panel then reviewed Claimants' respective work histories. Each Claimant had been laid off for at least some portion of each of the four thirteen-week periods preceding injury; thus, none had actually "worked" an entire thirteen-week quarter. For example, Claimant Reifsnyder, who was injured on November 23, 1998, had been laid off numerous times including, but not limited to: from 11–3–97 to 1–25–98, during the 1st thirteen-week period; from 2–25–98 to 3–2–98, during the 2nd period; from 7–20–98 to 8–9–98, during the 3rd period; and from 8–17–98 to 9–20–98, during the 4th period.[2] Because none of the Claimants actually

---

2. In the 52 weeks preceding Claimant Remp's October 14, 1998 injury, he was laid off: from 12–8–97 to 12–9–97, which is in the 1st period;

worked any complete 13–week period due to work layoffs, the panel held that benefits should be calculated pursuant to subsection 309(d.2). The panel reiterated its belief that "the issue was not whether Claimants were employed by Employer in the 52 weeks preceding their injuries. Rather, the issue is whether Claimants worked a complete 13 week period in the 52 weeks preceding their injuries." 826 A.2d at 21. This Court granted further review to consider the proper calculation of AWW in this not-uncommon work scenario.

■■■ Our standard of review in workers' compensation appeals is settled: We will affirm the adjudication below unless an error of law was committed, constitutional rights were violated, a practice or procedure of a Commonwealth agency was not followed or any necessary finding of fact is not supported by substantial evidence of record. 2 Pa.C.S. § 704; *Colpetzer,* 870 A.2d at 882; *Hannaberry,* 834 A.2d at 527. Here, the pertinent facts were stipulated to, and no party has alleged a constitutional violation or that an agency practice or procedure was not followed. The sole issue involves the proper manner of calculating AWW under the Act. Since this is a question of law, this Court's review is plenary. *Colpetzer; Hannaberry.* In conducting that review, we are cognizant of the fact that, "the Pennsylvania Worker's Compensation Act is remedial in nature and intended to benefit the worker, and, therefore, the Act must be liberally construed to effectuate its humanitarian objectives." *Peterson v. Workmen's Compensation Appeal Bd. (PRN Nursing Agency),* 528 Pa.279, 597 A.2d 1116, 1120 (1991) (collecting cases). Accordingly, " '[b]order-line interpretations of [the] Act are to be construed in [the] injured party's favor.' " *Hannaberry,* 834 A.2d at 528, *quoting Harper & Collins v. Workmen's Compensation Appeal Bd. (Brown),* 543 Pa. 484, 672 A.2d 1319, 1321 (1996) (citation omitted).

from 12–15–97 to 3–22–98, which is in the 1st and 2nd periods; and from 3–29–98 to 8–31–98, which includes the 2nd, 3rd and 4th periods. In the 52 weeks preceding Claimant Hoffa's October 23, 1998 work injury, Hoffa was laid off from: 10–23–97 to 3–11–98, which is in the 1st and 2nd periods; and from 3–12–98 to 8–5–98, which is in the 2nd, 3rd and 4th periods.

██ Employer contends that the Commonwealth Court's holding that subsection 309(d.2) applies in this scenario is contrary to both the structure and purpose of the amended Act. Employer posits that the various parts of Section 309(d) are designed to account for employment relationships of differing lengths: *i.e.*, Section (d) governs work relationships of one year or more; subsection (d.1) governs work relationships of more than one, but less than three consecutive periods of thirteen calendar weeks in the preceding year; and subsection (d.2.) governs the shortest of work relationships, *i.e.*, where the employee has worked less than a complete period of thirteen calendar weeks. Employer notes that each Claimant here was a long-term employee, not a recent hire; each had earnings in more than one thirteen-week period in the year prior to his injury; and each had suffered periodic layoffs in the year before injury as a result of purely economic factors. Employer maintains that the recent hire provision set forth in subsection 309(d.2) simply cannot apply in this scenario; instead, Section 309(d), which looks to a claimant's actual earnings during the relevant periods within his recent, continuous employment relationship, is the only proper and accurate measure of AWW. Employer also cites numerous cases in which this Court and the Commonwealth Court alike have recognized that being "employed" does not necessarily refer only to the days the employee works, but encompasses the entire period of an ongoing employment relationship.[3] Employer argues that these cases recognize that subsections 309(d.1) and (d.2) are only applicable where there is no long-term employment relationship, which is simply not the case here.

Employer also argues that applying Section 309(d) in this particular work scenario furthers the recognized purpose of the 1996 amendments, which was to ensure an accurate and

**3.** Employer cites cases including *Triangle Building Center v. Workers' Compensation Appeal Bd. (Linch)*, 560 Pa.540, 746 A.2d 1108 (2000); *Colpetzer v. Workers' Compensation Appeal Bd. (Standard Steel)*, 802 A.2d 1233 (Pa.Cmwlth.2002), *affirmed*, 870 A.2d 875 (Pa.2005); *Port Auth. of Allegheny County v. Workers' Compensation Appeal Bd. (Cooley)*, 773 A.2d 224 (Pa.Cmwlth.2001); and *Norton v. Workers' Compensation Appeal Bd. (Norton)*, 764 A.2d 704 (Pa.Cmwlth.2000).

realistic measure of an injured worker's earning capacity. Employer asserts that applying Section 309(d), and thereby accounting for the periods of layoff which are typical in these longstanding employment relationships, is the most accurate measure of the recent economic reality for these particular workers:

> Pursuant to the collective bargaining agreement here, the reality of each of these claimant's earning experience is that during periods of employment, the employees would work substantial hours, including overtime, then there would be periods of lay-offs due to economic reasons. This is the economic reality for these claimants, who would collect unemployment benefits during the periods of layoff, as well [as] employer-paid supplemental unemployment benefits (SUB), pursuant to the collective bargaining agreement. These long[-]term employees were accustomed to periods of boom when the plant was running at full production, with plentiful overtime hours available, followed by periods of bust, during which layoffs were the norm. Nonetheless, the employment relationship continued. . . .

Brief of Appellant, 15. Employer further notes that each Claimant here in fact returned to work after recovering from his injury, and each continued to experience occasional layoffs which, Employer argues, proves that accounting for such layoffs is the most accurate measure of earning capacity in this particular line of employment. In contrast, Employer notes, the Commonwealth Court panel's application of subsection 309(d.2) "artificially inflate[s]" the typical earnings for these claimants.

Finally, Employer maintains that application of subsection 309(d.2) in the case of long-time employees who are periodically laid off for economic reasons would result in an arbitrary application of the Act to the detriment of both employees and their employers. Employer posits that different employees in materially identical situations could be treated differently, depending on the fortuity of how soon after a layoff an injury occurs. Employer argues that Section 309(d), which focuses on the length of the employment relationship and provides a

fuller picture of the relationship, avoids such inconsistent application.

Claimants agree with Employer that the amendments to Section 309(d) were designed to ensure an AWW which is an accurate measure of future wage loss caused by a present work injury.[4]  Claimants argue, however, that the layoffs that they were subjected to in the year before their injuries were "atypical" and "aberrant," and any AWW computation which factored in these periods of no-wage layoff would inaccurately reflect their economic reality and leave them under-compensated.  Claimants submit that they were earning their "customary" hourly wages at the time of their work injuries, and accordingly, their AWW should be based upon an extrapolation from those typical hourly wages, as provided by subsection 309(d.2).

Alternatively, Claimants contend that the Commonwealth Court was correct in holding that subsection 309(d.2) applies here as a matter of statutory construction, because Claimants did not "work" a single full thirteen-week period in the year prior to their work injuries.  Claimants note that Section 309(d) provides the AWW formula for employees who were "employed" for three or more 13–week periods and subsection 309(d.1) likewise applies to employees "employed" for more than one but less than three completed 13–week periods.  Subsection 309(d.2), however, has a different focus:  it applies to "employees" who have "worked" less than a complete 13–week period.  Claimants maintain that the General Assembly must be presumed to have intended a different analysis when it used the distinct term "worked."  Claimants' continuous employment relationship therefore cannot be deemed controlling on the question of the applicability of subsection 309(d.2); the fact that they "worked" less than a full 13 weeks in the quarter immediately preceding their work injuries and worked no other completed quarters, requires that their AWW should be calculated pursuant to subsection 309(d.2).

4.  Claimants have filed a single, joint brief as appellees.

Claimants characterize subsection 309(d.2) as a "savings clause" intended to protect an injured hourly wage worker from the harsh consequences that could result from application of Section 309(d) and subsection (d.1) in instances like these. In this regard, Claimants necessarily dispute the notion that subsection 309(d.2) was intended to apply only to new employees, noting that the General Assembly could have expressed that intention more clearly by adopting limiting language like "new employees who work less than 13 weeks" or speaking in terms of the length of employment (as Section (d) and subsection (d.1) do). Instead, Claimants emphasize that the provision speaks only of "employees" who "work" less than "a complete period of thirteen weeks."

Claimants also argue that there is nothing in the structure of Section 309 to suggest that the General Assembly intended that hourly-wage workers subject to layoff should find a reduction in the calculation of their AWW, when otherwise identically situated salaried workers are not subject to the same reduction. Claimants note that Sections 309(a), (b), and (c), which govern injured workers paid on a yearly, monthly and weekly basis respectively, do not require that the worker actually worked all of the weeks in some look-back period in order to have his AWW fixed according to his salary. In other words, the assertion is that there is no provision in those Sections that would allow for a reduction in AWW in instances where the worker was subject to layoff, furlough or other break in pay. Since Section 309 does not penalize salaried workers for layoffs, and does not specifically address layoffs, furloughs, or other periodic work cessations, Claimants argue that it should not be construed as reflecting an intention that hourly-wage workers should have their AWW calculation "deflated," merely because they had been laid-off in the previous year.[5]

5. We note that Employer and Claimants both seem to assume that, in a scenario involving a long-time employee subject to periodic layoffs, the AWW always will be greater if calculated under subsection (d.2) rather than under (d). The validity of this assumption is not self-evident. In theory, if a long-time employee were laid off for a consistent and predictable number of days each year (or each quarter), the computa-

Finally, with respect to their continuous employment status, Claimants note that this status did not prevent Employer from laying them off during the look-back period, thus creating periods of no-work and no-pay "employment." Claimants corroborate Employer's claim that they received unemployment benefits during these periods, but argue that, by definition, those unemployment benefits arose precisely because they were not then "employed." [6] Claimants argue that to include these periods of no-work/no-pay "employment" as if they were periods of gainful employment artificially deflates their true earning capacity. In a situation such as this, Claimants argue, subsection 309(d.2) provides the most accurate basis for calculating AWW.

Although the specific issue presented in this case is one of first impression, this Court does not write upon an entirely blank slate. Three decisions from this Court—*Triangle Building Center, supra, Hannaberry, supra,* and *Colpetzer, supra*—are particularly helpful to our consideration. *Triangle Building Center* involved a concurrent employment situation governed by the last clause of Section 309(e) of the Act, which provides that where an employee is working under concurrent contracts with multiple employers, his wages from all employers "shall be considered as earned from the employer liable for compensation." 77 P.S. 582(e). The claimant in *Triangle Building Center* had been laid off by one employer for approximately two months at the time he was injured in the other employer's employ. The question for this Court was whether the temporary layoff from the concurrent employment "precluded assessment of [the claimant's] concurrent earnings experience within the average weekly wage calculation." 746

tion under the two provisions would be the same. The "expected" number of hours multiplier in (d.2) would be the same as the hours actually worked and compensated under (d). In scenarios where the periods of layoff are not predictable, however, it would appear that (d.2) could lead to a greater or lesser AWW, depending upon the circumstances.

6. Although the parties agree that unemployment benefits were paid, we note that this fact is not contained in the parties' stipulations below. Strictly for purposes of decision, this Court will accept the parties' mutual assertion.

A.2d at 1109. This Court answered that question in the negative.

In so holding, we noted that "[t]he Act seeks to compensate claimants for the ongoing loss in earning capacity resulting from their injuries; therefore, some reasonable assessment must be made of claimants' pre-injury ability to generate further earnings." The Court explained that the mechanics of the legislative scheme revealed an intention that the "baseline figure from which benefits are calculated should reasonably reflect the economic reality of a claimant's recent pre-injury earning experience, with some benefit of the doubt to be afforded to the claimant in the assessment." 746 A.2d at 1112. This Court then concluded that the General Assembly directed inclusion of concurrent wages in the benefits computation "to create a reasonable picture of a claimant's pre-injury earning experience for use as a projection of potential future wages and, correspondingly, earnings loss." *Id.* at 1113.[7]

In *Hannaberry*, 575 Pa. 66, 834 A.2d 524, this Court similarly emphasized that Section 309 "was obviously intended to ensure an accurate calculation of wages in the myriad employment scenarios arising in today's workplaces." *Colpetzer*, 870 A.2d at 884 (characterizing *Hannaberry* ); *Hannaberry*, 834 A.2d at 532–33 (structure and language of Section 309 make apparent that "a 'fair ascertainment' of the employee's wages is the legislative intendment"). In *Hannaberry*, the question was whether a seriously and permanently injured full-time teenage worker, whose full-time employment was immediately preceded by part-time after-school employment, should have those periods of part-time employment included in the calculation of his AWW. After recognizing that Section 309 did not specifically address this precise work scenario, this Court reasoned that inclusion of the quarters in which the claimant had worked part-time after school would result in an underestimation of his actual wages and earning capacity. According-

---

**7.** Ultimately, the *Triangle Building Center* Court held that the claimant had maintained a sufficiently intact, ongoing employment relationship with the concurrent employer, and thus, his past earnings experience remained a valid predictor of future earnings loss. *Id.*

ly, we held that the claimant's AWW was to be calculated using only the quarter in which he had worked full-time. We noted, *inter alia*, that this construction of the statute furthered the overall legislative purpose of Section 309 to provide for an accurate measurement of the AWW and also avoided an absurd and unreasonable result. 834 A.2d at 533–34.

This Court's most recent decision, *Colpetzer*, involved claimants whose work injuries occurred within a year of previous work injuries for which they had received workers' compensation benefits. The issue was how properly to calculate the AWW in instances where there were relevant weeks in the look-back period in which no wages were earned only because of prior disabling work injuries. The employers argued that these periods should be included in a calculation of AWW under Section 309(d) as periods of zero wages, while the claimants argued, among other points, that the AWW could properly be computed under Section 309(d) only if the AWW for the no-wage periods were fixed by importing the AWW which had been already established for the claimants' prior disabling work injuries.

After reviewing *Triangle Building Center* and *Hannaberry*, the *Colpetzer* Court agreed with the claimants' construction of Section 309(d). We recognized that Section 309 does not explicitly address the proper method for calculating AWW where a previous work injury deflated the worker's otherwise typical wages. Relying upon the overall humanitarian purpose of the Act and the clear legislative intention that workers injured on the job be paid a fair benefit based upon an accurate calculation of their actual work history and earning capacity, we reasoned that:

> It is not an accurate measure of economic reality to treat periods where no wages were earned solely because the worker was unfortunate enough to have suffered a previous work injury, as if the worker had no earning **capacity** for those periods. Such an approach would severely underestimate the reality of the worker's typical earnings, punish the worker for no reason approved in the legislation, and con-

tradict the overriding legislative goal of accuracy in calculation.

870 A.2d at 886 (emphasis original). Accordingly, this Court rejected the employer's argument that the periods at issue should be computed as "zero wages;" instead, we held that the previously-established AWW was the proper measure, for purposes of a calculation under Section 309(d).

In the cases *sub judice*, as in *Hannaberry* and *Colpetzer*, the statute does not specifically address the work scenario presented; *i.e.*, there is no explicit mention in the statute of whether and how, in the calculation of AWW, to account for periods when a worker was laid off in the previous year, much less how to account for such layoffs if they are a common occurrence in a long-term employment relationship. Nevertheless, we believe that the structure and plain language of the statute clearly indicate that Section 309(d), not subsection 309(d.2), controls the calculation and also provides an accurate measure of such a type of worker's economic reality and earning capacity. As previously stated, Section 309(d) and subsections (d.1) and (d.2) address work/employment relationships of differing lengths. Section 309(d) governs employees with the longest work/employment histories—*i.e.*, employees who have been employed for at least four consecutive periods of thirteen calendar weeks. Subsections (d.1) and (d.2) address progressively shorter employment relationships: (d.1) governs employees employed for at least one, but less than three consecutive periods of thirteen calendar weeks; while (d.2) addresses cases of recent hires, *i.e.*, employees who worked less than a single complete period of thirteen calendar weeks at the time they suffered a work injury.

The structure of the statute strongly indicates that subsection (d.2) was not intended to apply to employees, such as Claimants here, with long-term employment relationships with their employer, who happen to have been subject to layoffs. Both (d) and (d.1) include look-back periods encompassing the preceding fifty-two weeks, in search of "completed" thirteen-week periods; in contrast, subsection (d.2) has no such long-term focus, and indeed, it provides for a **prospective**

calculation of potential earnings. By its terms, (d.2) contemplates persons for whom there is little work history with the employer upon which to calculate the AWW. Viewing the interrelationship of these subsections, we deem it unlikely in the extreme that the General Assembly intended (d.2) to supplant (d) or (d.1) anytime a long-term employment relationship happens to involve periods with a "work" cessation. Instead, we conclude that subsection (d.2) was intended for instances that it plainly covers; *i.e.*, those instances of work injuries to recently-hired employees for whom there was, by definition, no accurate measure of AWW other than taking the existing hourly wage and projecting forward on the basis of the hours of work expected under the employment agreement.

Claimants here had a long-term employment relationship by which their actual history of earnings and earning capacity could be measured fairly, and we think the statute clearly was designed to capture that entire relevant period, rather than projecting an AWW from their hourly wages. Although they were subject to periodic layoffs, these Claimants nevertheless maintained continuous employment relationships with Employer, indeed for periods of fifteen and nineteen years. Thus, even in those down times where layoffs occurred, Claimants retained significant rights/accoutrements of employment, such as plant seniority, healthcare and sick leave benefits, and employer contributions to their retirement accounts. In addition, Claimants all returned to work with Employer following their respective layoffs, evidencing an ongoing employment relationship despite the periods of inactivity. Notably, the general rule set forth in Section 309(d) does not speak in terms of the continuity of "work," but rather, the continuity of the "employment" relationship. The fact that Claimants were not "working" during the periods when they were laid off does not mean that their long-term "employment" relationship was severed. *See Colpetzer,* 870 A.2d at 886 n. 9 ("The fact that the Claimants in these appeals were not 'working' during their periods of disability does not mean that they were no longer 'employed' by their employers.").

Claimants' argument premised on the fact that subsection (d.2) speaks of periods of "work," in contrast to the "in the employ of the employer" language found in (d) and (d.1), is unpersuasive. Employer responds to Claimants' argument by suggesting that recent hires subject to subsection (d.2) may still be in a probationary work period, and thus not be deemed in the technical "employ" of the employer; or they may be transient workers who fail to complete a thirteen-week period of employment with any one employer in a given year. Given the variety of circumstances attending such short-term or incipient employment relationships, Employer argues, it was sensible for the General Assembly to use the term "worked" rather than the "in the employ of" language which was used to describe relationships of a longer duration. Viewed in light of the overall structure of the Act, as described above, Employer's reading is persuasive. In any event, we fail to see how subsection (d.2) can be read as revealing a legislative intent to negate the very language just employed to cover the longer-term employment relationships clearly contemplated in (d) and (d.1). Moreover, since the legislative scheme generally looks to the year past as the most accurate measure of AWW, it would be illogical to "project" the number of hours an employee was "expected" to work as the basis for fixing his AWW in an instance where, as here, there is in fact an on-going employment relationship, albeit one subject to periodic layoffs, for the year-long period preceding the work injury.

The other arguments posed by Claimants are equally unpersuasive. Claimants argue that including periods of layoff pursuant to Section 309(d) leads to a situation where hourly-wage workers are treated unequally compared to salaried workers, whose wages are not offset if they were subject to layoffs. But this fact this does not mean that Section 309(d) is an inaccurate measure of the injured hourly worker's earning capacity or AWW; to the extent there is an inaccuracy, it would consist of an over-calculation of the AWW for salaried workers subject to layoff. Though this perceived inequity might be a basis upon which to seek legislative relief, it is no basis upon which this Court may refuse to apply the statute as

plainly written. Moreover, Claimants' argument that subsection (d.2) should control would not necessarily address the inequity they believe they have discovered. The "terms of employment" spoken of in (d.2) could well include periods of anticipated layoff, and could thereby reduce the number of hours the employee was expected to work.

Similarly unpersuasive in light of the plain statutory construct is Claimants' argument that the layoffs at issue here supposedly were atypical or aberrational. Presumably, by forwarding this argument, Claimants mean to suggest that they were subject to shorter layoffs in years past. The statute, however, fixes a look-back period of a certain length as the best measure of earning capacity. There can be a myriad of reasons why a worker's pay varies from year to year. It was the prerogative of the General Assembly to fix the relevant look-back period, and it has determined that the past year is the best measure for fixing AWW in the case of long-term employees.

■ Finally, we note that our holding is consistent with this Court's recent decision in *Colpetzer*, which was announced after this matter was briefed and argued. We realize that the parties are in agreement that Claimants in the case *sub judice* received unemployment compensation for periods of work layoff. The fact that no wages are deemed attributable to these periods of layoff, notwithstanding receipt of unemployment benefits, is consistent with *Colpetzer* because a person who is laid-off from work is not in the same situation *vis a vis* the Workers' Compensation Act as a person who is rendered unable to work, or whose work options are restricted, because of a work injury. The laid-off worker can seek to supplement his income with another job; the disabled worker either cannot do so at all or, at a minimum, is impaired in his ability to obtain comparable employment. The Act concerns itself with compensable work injuries and their effect upon earning capacity; a decline in a worker's earnings which results from business or economic forces is not the same as a decline in that worker's earnings due to a job-related impairment. The Workers' Compensation system operates to insure a worker

against the economic effects of a workplace injury, not against the economic effects of variations in the business cycle. Thus, inclusion of unemployment compensation benefits paid out during a work layoff is not required in order to ensure an accurate measure of a worker's earnings history and earning capacity.

For the reasons specified above, we hold that Section 309(d) controls the computation of AWW in this case. Our conclusion is consistent with our recognition in *Colpetzer, Hannaberry*, and *Triangle Building Center* that the purpose of the Section is to accurately capture economic reality.[8] Accordingly, we reverse the order of the Commonwealth Court.

Reversed.

Justice BAER files a concurring opinion in which Chief Justice CAPPY, Justice NIGRO and Justice NEWMAN join.

Justice SAYLOR files a dissenting opinion.

## *CONCURRING OPINION*

Justice BAER.

I join the thorough and well-reasoned majority opinion reversing the decision of the Commonwealth Court and holding that Section 309(d) controls the computation of AWW in this case. I write separately only to distance myself respectfully from the majority's conclusion that unemployment compensation benefits should not be included in the computation of an employee's AWW under Section 309(d) where an employee's relationship with an employer involves periodic layoffs. Maj. Op. at 358–60, 883 A.2d at 548. Notwithstanding that the parties could have directly raised, briefed and argued this issue explicitly before this Court, they have not. Therefore, I believe it would be more prudent to delay consideration of this difficult issue until a party raises it directly and the

---

8. We also note that our conclusion that Section 309(d) controls is consistent with the humanitarian objective of the Act. In this instance, application of Section 309(d) provides an accurate measure of these workers' recent earnings history and earning capacity.

Court has the benefit of focused advocacy concerning whether inclusion of the unemployment compensation benefits in the AWW would provide a more "accurate measure of a worker's earnings history and earning capacity." Maj. Op. at 358–60, 883 A.2d at 548. In all other respects, I join the erudite majority opinion.

Chief Justice CAPPY, Justice NIGRO and Justice NEWMAN join this concurring opinion.

### DISSENTING OPINION

Justice SAYLOR.

I would affirm based on the reasoning applied by the Commonwealth Court, which I believe implemented a plain-meaning interpretation of the relevant statutory provisions. *See Reifsnyder v. WCAB (Dana Corp.)*, 826 A.2d 16 (Pa. Cmwlth.2003); *accord Bethlehem Structural Products v. WCAB (Vernon)*, 789 A.2d 767 (Pa.Cmwlth.2001). Although the majority also lays claim to the application of a plain-meaning approach, I am not persuaded that this characterization is supported. In this regard, while on the one hand the majority gives effect to the substantial difference in connotation between the terms "work" and "employment" in some aspects of its analysis, *see* Majority Opinion, *op.* at 357–58, 883 A.2d at 547 ("Notably, the general rule set forth in Section 309(d) does not speak in terms of the continuity of 'work,' but rather, the continuity of the 'employment' relationship."), it nevertheless proceeds to equate these two terms in a pivotal passage construing Section 309(d.2). *See id.* at 357–58, 883 A.2d at 547 (equating "employees who worked less than a single complete period of thirteen calendar weeks at the time they suffered a work injury" exclusively with "recent hires" for purposes of Section 309(d.2)).

I respectfully dissent, as I believe that the Commonwealth Court's more consistent treatment of the distinct statutory terms involved is the better one. *See Reifsnyder*, 826 A.2d at 20 ("[T]he issue is whether Claimants *worked* a complete 13 week period in the 52 weeks preceding their injuries." (empha-

sis in original)). Given the specific terms selected by the Legislature, and particularly since the relevant policy considerations and equities are substantially mixed,[1] it seems to me to be preferable to leave the task of any necessary adjustments to the statutory compensation scheme to the Legislature, within constitutional limitations.

1. The effort to implement a comprehensive workers' compensation system entailing standardized benefit formulas implemented in the course of an underlying trade-off between loss spreading and insulation of employers from tort liability inherent in the workers' compensation scheme, *see generally* 2 A. LARSON, THE LAW OF WORKMEN'S COMPENSATION, § 60.31(c), at 10–751–52 (1993), is bound to yield results that, viewed from the individual perspective of claimants and employers in discrete cases, may appear inequitable.