**ELLIOTT TURBOMACHINERY COMPANY and ITT Specialty Risk Services, Petitioners**

v.

**WORKERS' COMPENSATION APPEAL BOARD (SANDY), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 3, 2006.
Decided May 2, 2006.

Heather Troxel Feinstein, Pittsburgh, for petitioner.

Daniel K. Bricmont, Pittsburgh, for respondent.

BEFORE: COLINS, President Judge, and FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY President Judge COLINS.

Before the Court is the appeal of Elliott Turbomachinery Company (employer), from the order of the Workers' Compensation Appeal Board (Board) affirming the decision of a workers' compensation judge (WCJ) that granted Delbert Sandy's (claimant) claim petition for compensation benefits pursuant to the provisions of the Pennsylvania Workers' Compensation Act (Act).[1] The WCJ awarded benefits on the basis that Delbert Sandy suffered a hearing loss as a result of his employment at Elliott Turbomachinery Company (employer), and calculated his benefit award pursuant to Sections 306(c)(8)(i) and 309(d.1)

of the Act. We affirm in part and vacate in part.

On February 28, 2002, claimant filed a claim petition alleging that as of February 26, 2002, while in the employ of employer as a machinist, he had sustained a binaural hearing loss greater than 10% due to continuous exposure to hazardous occupational noise.[2] Employer denied all allegations set forth in the petition, and the matter was set before a WCJ for hearings.

In support of his claim petition, claimant testified and presented the medical report, audiogram, and deposition testimony of Michael C. Bell, M.D., board certified in Otolaryngology. In opposition to the petition, employer presented the deposition testimony[3] of 17 people, who all worked in

---

**1.** Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4; 2501–2626.

**2.** Section 306(c)(8)(i) of the Act provides, in pertinent part:

> (8)(i) For permanent loss of hearing which is medically established as an occupational hearing loss caused by long-term exposure to hazardous occupational noise, the percentage of impairment shall be calculated by using the binaural formula provided in the Impairment Guides. The number of weeks for which compensation shall be payable shall be determined by multiplying the percentage of binaural hearing impairment as calculated under the Impairment Guides by two hundred sixty weeks. Compensation payable shall be sixty-six and two-thirds per centum of wages during this number of weeks....
>
> 77 P.S. § 513(8)(i).

**3.** Those who testified regarding their experience at the plant, their opinion regarding the noise level at the plant, and/or the particulars of Dr. Thornton's study are as follows:

> Mary Ellen Stilwell, a consultant employed by employer who spent part of her time in the Health and Safety Department; John Swat, Manager of Health and Safety, trained to obtain sound measurements with dosimeters; Registered Nurses Leonore Goodman and Mary Ellen Sturnick, employed by employer who, as part of their duties, performed audio-

grams on employer's employees; Gary Bargy of Metrosonics, Inc., the company to which employer sent its dosimeters for repair and recalibration; Charles DePalma, employed by employer as a production manager; Dennis Majewski, Manager of Facility Planning for employer, who oversaw buying and selling of equipment costing more than $1,000, and who testified regarding the type of equipment purchases and that the equipment purchased met the OSHA standard of 85 decibels. Also testifying were: Thomas McCartney, who managed various departments throughout employer's company including the Heavy Machining, Rotor Division, and Fabrication; Robert Leyshock, employed by employer as the Manager of Environment and Industrial Hygiene; Willis Keefer, who worked as the second shift supervisor; Wayne Overly, who was the first shift supervisor of the machining, the assembly, and test floor of the Plant Air Packaging (PAP) division; Dennis Gentilo employed as the Manager for the Fabrication Division; William Mock, who testified regarding the moving of machines throughout employer's plant; Stephen Debich, who worked for employer as a pipe fitter prior to his retirement in 2000; Michael Grosso, who worked as an assembler and tester A and also as PAP assembler; Dennis L. Andros, who worked as a painter, water tester, production helper in various divisions; Roger Dean Albright, who worked throughout the plant as a maintenance helper; James Smoloc, who

varying capacities throughout employer's plant and who all testified as to the noise levels at employer's premises, and various tests taken to establish the noise level. In addition, employer presented the deposition testimony of William R. Thornton, Ph.D., P.E.,[4] John Earshen, Dennis Giardino, and Donald Henderson, Ph.D.,[5] and Sidney N. Busis, M.D., board certified in Otolaryngology, all of whom testified to claimant's lack of exposure to hazardous noise and long-term hazardous noise. In addition, employer submitted Dr. Busis' deposition testimony setting forth his medical opinion that claimant's binaural hearing loss of 11.25% was not related to claimant's exposure to hazardous noise.

At the hearings, Claimant credibly testified regarding his employment and his various personal activities. Claimant testified that he has been in the employ of Elliott Turbomachinery Company since 1967, has worked solely for employer and on the infrequent occasions when he has missed work it has been due to a non-work-related injury in 1991, a heart attack in 1996, and voluntary layoffs that arose on an intermittent basis. Claimant testified that in his early years, he was a hydro tester. He later assembled machines and filled machines with water to check for leaks; he worked in water and air testing; and, he worked in the burn and grind department where he removed burrs and cleaned castings. From 1970 to 1983 he worked principally as a lathe operator, operating a turret lathe in an area that had on average 25 machines operating at one time. From 1983 to 1991 he worked as a machine operator, and as of March 2003 he was working in the Quick Action Department. Claimant's testimony is peppered with statements describing the excessive noise level throughout the plant. The consistent description is that the work environment over the years was generally loud and reaching severe levels at times, with the level varying in intensity depending on the shift, and depending on the type of metal being cut. Claimant testified that the noise level after 1991 was worse than the noise level in 1970 to 1983 because the Quick Action Department was transferred next to the powerhouse. Claimant consistently wore disposable earplugs beginning in 1974, wearing them approximately 70 to 80% of the time beginning in 1993. Claimant testified that beginning in 1993 he experienced ringing in his ears.

Claimant's testimony also reflected on his youth activities and family medical history. Claimant testified that there was no family history of hearing loss except for his father's diminution in hearing beginning around the age of 85. Claimant also testified that he began small game hunting around the time he was 15 or 16 and continued to hunt until 1988. Claimant did not wear hearing protection when hunting.

worked as a general laborer; and, Jim Elliott who worked as a motor assembler, and in various other positions, prior to his retirement in 2000. The cumulative testimony of the witnesses is that there was noise in varying levels throughout the plant. The WCJ found the testimony credible. The WCJ set forth each witness's testimony and explained any limitations of the testimony; for example, the testimony of Registered Nurses Goodman and Sturnick, who were not certified audiologists and who did not perform an otoscopic examination before performing the audio-

gram. (WCJ Finding of Fact No. 7i, j.) Mr. DePalma testified regarding machines at the plant and the volume of noise generated, and also admitted that employer had received complaints from its neighbors regarding noise. (WCJ Finding of Fact No. 9n.)

4. William R. Thornton, Ph.D. has his doctorate in the field of acoustics, vibration, and noise.

5. Donald Henderson, Ph.D. has his doctorate in sensory psychology.

Claimant's hearing was tested when he was first hired, and when he returned to work following a layoff. Beginning in the early 1990s employer began testing employee hearing on a yearly basis. Claimant testified that he first began to notice hearing problems in 1992. (Deposition Testimony, July 11, 2002, pp. 36–39, 59.) Claimant's hearing was tested by employer on a yearly basis. Claimant first realized that he was suffering with hearing loss in 2002 following a visit with Dr. Bell.

The WCJ also found credible the testimony of Dr. Bell. Dr. Bell's testimony is that his conclusions are based on the history he took of claimant, his examination of claimant, and his review of claimant's medical records. Dr. Bell's testimony recapitulates the history set forth above. Dr. Bell's testimony is that he did not find claimant's hunting a significant event in bringing about the auditory issues, noting that the hunt occurred approximately five times a year. However, Dr. Bell did find significant claimant's work place environment.

Dr. Bell took note of claimant's description of the noise sources as machine tools, testing area, and powerhouse. Dr. Bell also took note of claimant's description of the noise as being so severe that claimant's ears would hurt and he would get dizzy and nauseated. Dr. Bell further noted that claimant had stated that sometimes after work, claimant's hearing was so decreased that he heard almost nothing for two or three hours.

Based on the examination and the history, Dr. Bell noted that Claimant's physical examination was normal, and his external auditory canals were clear and the tympanic membranes normal. Dr. Bell opined that claimant suffered from a binaural hearing impairment of 15.625%, which he attributed to Claimant's cumulative exposure to loud noise at his place of employment. (Dr. Bell's Report.)

The WCJ rejected employer's affirmative defense[6] that admits claimant's exposure to noise, but argues that it was not hazardous, i.e., as noise exceeding the permissible exposure levels set forth by the Occupational Safety and Health Administration regulations.[7] Presented was the testimony of varying witnesses all supporting employer's position that any exposure to loud noise was not hazardous. The most notable testimony was that of William R. Thornton, Ph.D., a consulting engineer, who as previously noted, has his doctorate in the field of acoustics, vibration, and noise. The WCJ found Dr. Thornton's testimony unpersuasive. The capsulated version of his testimony is that following a four-month noise study of all of the jobs in Employer's plant, and after visiting and testing all the various areas, and reviewing all the job codes at the facility, the data showed that the employees of Elliott Turbomachinery, Inc., were not exposed to long-term hazardous noise, as defined under Pennsylvania law.

After reviewing Dr. Thornton's study, the WCJ noted that it did not reflect claimant's noise exposure while working

---

6. Section 306(c)(8)(x) of the Act, 77 P.S. § 513(8)(x), provides that "[w]hether the employe has been exposed to hazardous occupational noise or has long-term exposure to such noise shall be affirmative defenses to a claim for occupational hearing loss and not a part of the claimant's burden of proof in a claim."

7. Section 306(c)(8)(iv) of the Act provides that "[t]he percentage of hearing impairment for which compensation may be payable shall be established solely by audiogram. The audiometric testing must conform to OSHA Occupational Noise Exposure Standards, 29 CFR 1910.95 (relating to occupational noise exposure) and Appendices C, D and E to Part 1910.95 (July 1, 1994)." 77 P.S. § 513(8)(iv).

for employer and did not adequately reflect the true nature of the work place. For example, the study did not measure noise when there were steam leaks or when there was testing on the boilers, both instances in which claimant testified there was a significant increase in work place noise. The WCJ found that Dr. Thorton's study was not reflective of the work environment and rejected his testimony as not credible. The WCJ further rejected all testimony that relied on Dr. Thornton's study. To that end, she rejected the testimony of John Earshen, Dennis Giardiono, and Dr. Henderson.

The WCJ was also not persuaded by the testimony of Robert Leyshock, employer's Manager of Environmental and Industrial Hygiene, and Dennis Giardino, former division of the federal Mines Health and Safety Administration who reviewed Dr. Thornton's study. The combined testimony of Leyshock and Giardino is that the study of Dr. Thornton was very thorough and extensive, and proves that no employee was exposed to a sufficient number of out-of-compliance days within any 52–week period so as to constitute long-term, hazardous noise during production years 1994 through 1999. (Exhibit FF; Deposition Testimony, February 15, 2002, pp. 20–27.)

Lastly, the WCJ was not persuaded by the findings and conclusions of Sidney M. Busis, M.D., who examined claimant on May 17, 2002,[8] and issued a supplemental report after his review of claimant's testimony. In his June 25, 2002 supplemental report, Dr. Busis sets forth claimant's family, personal, and work history. Dr. Busis found that claimant's physical examination was normal. Dr. Busis examined claimant on a day in which claimant did not work a full shift, he wore his protective hearing gear, and when the environment was less noisy than usual. (WCJ Finding of Fact No. 38.) The WCJ found that Dr. Busis interpreted the audiogram as showing normal hearing bilaterally through 1000 Hz with a moderate loss in the high frequencies on the left and a moderately severe loss in the high frequencies on the right. Dr. Busis calculated claimant's hearing impairment, based on the May 17, 2002, audiogram as 11.25% on the right, 11.25% on the left, and 11.25% binaurally.

Dr. Busis further testified that the audiogram did not produce findings typical of occupational noise-induced hearing loss as the claimant did not have a 4000 Hz notch on the left and only had a shallow notch on the right. Dr. Busis opined that the hearing loss on the left was consistent with gunfire. Dr. Busis testified that based on his review of the noise studies, the report issued by Dr. Thornton, and the testimony of the various Elliott Turbomachinery personnel, he would not attribute any worker's hearing loss at employer's company to occupational noise incurred at employer's premises because the study revealed no long-term hazardous noise exposure. (Deposition Testimony, Dr. Busis, pp. 12, 15.)

Based on the evidentiary findings, the WCJ granted the claim petition and awarded benefits on January 31, 2002 based on an average weekly wage (AWW) of $853.13. The WCJ calculated wages based on Section 309(d.1) of the Act, 77 P.S. § 582(d.1), concluding that claimant's employment was not continuous during the 52 weeks preceding the injury. The WCJ based her conclusion regarding wages on the fact that claimant had been laid off for the periods March 26, 2001 through and

---

**8.** We note there is a discrepancy between the WCJ's Finding of Fact No. 31 and the opinion of the Board regarding the date of examination. We have reviewed the record and conclude that the date of examination was May 17, 2002 and that the report was issued June 25, 2002. (Deposition testimony, page 5.)

including April 1, 2001, and April 16, 2001 through and including April 29, 2001, and June 25, 2001 through and including August 19, 2001, and that claimant was not required to be in contact during the lay-off period. Thus, concluded the WCJ, since claimant was not required to keep in touch with employer during layoffs, claimant was not employed by employer for three complete calendar quarters prior to injury, and the average weekly wage should be calculated in accordance with Section 309(d.1) of the Act, 77 P.S. § 582(d.1). The Board affirmed.

In its appeal to this Court, employer raises three issues. First, employer asks whether the WCJ erred in calculating claimant's average weekly pursuant to Section 309(d.1) of the Act, 77 P.S. § 582(d.1), rather than Section 309(d) of the Act, 77 P.S. § 582(d). Second, employer asks whether the WCJ erred as a matter of law by misapplying 29 C.F.R. § 1910.95 in derogation of Section 306(8)(iv) of the Act, 77 P.S. § 513(8)(iv). Third, employer asks whether the WCJ's findings are based on substantial evidence. We shall review the issues in reverse order.

■ Initially, we note that when reviewing appeals from the Workers' Compensation Appeal Board, this Court is mandated to affirm the holding of the Board unless there has been a constitutional violation, the WCJ's findings of fact are not supported by substantial evidence, or the WCJ's has committed an error of law. 2 Pa.C.S. § 704; *Reifsnyder v. Workers' Compensation Appeal Board (Dana Corp.)*, 826 A.2d 16 (Pa.Cmwlth. 2003), *reversed,* 584 Pa. 341, 883 A.2d 537 (2005). Further, the determination of a workers' compensation claimant's AWW is a question of law, and this Court's review on appeal is plenary. *Gartner v. Workers' Compensation Appeal Board (Kmart Corp.)*, 796 A.2d 1056 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 572 Pa. 713, 813 A.2d 846 (2002). We shall first address the issue of whether there is substantial evidence to support the findings and conclusions of the WCJ.

Employer contends that the Board erred in affirming the WCJ's conclusion that claimant was exposed to hazardous noise. Employer directs our attention to the fact that the studies performed by Dr. Thornton establish that the noise levels were within acceptable limits, and that the workplace was OSHA compliant. Finally, employer asserts that the WCJ impermissibly required employer to obtain dosimeter testing as opposed to sound level measurements when measuring the noise produced by powerhouse steam leaks.

■ Generally, in a claim for hearing loss benefits, a claimant has the burden of proving not only the degree of hearing loss, but also that the hearing loss was caused by his employment. *Rockwell Int'l v. Workers' Compensation Appeal Board (Sutton)*, 736 A.2d 742 (Pa.Cmwlth.1999), *petition for allowance of appeal denied,* 563 Pa. 623, 757 A.2d 936 (2000). No presumption exists in favor of a claimant on the issue of causation. *Id.* The claimant must prove that he suffers from a permanent hearing loss of 10% or greater that is medically established to be work-related, and caused by the long-term exposure to hazardous occupational noise. *Id.* Once claimant meets his burden, employer may assert an affirmative defense that a hearing loss due to non-occupational or previous occupational causes was present at or prior to the time of employment, or, that claimant's exposure to such noise was not hazardous or long term. Section 306(c)(8)(vi), (x) of the Act, 77 P.S. § 513(8)(vi), (x).

Hazardous occupational noise means noise levels exceeding permissible noise

exposure as defined in Table G–16 of OSHA Occupational Noise Exposure Standards of the federal government found in 29 C.F.R. § 1910.95. Section 105.4 of the Act, 77 P.S. § 25.4. Long term means exposure exceeding the permissible daily exposure for at least three days each week for 40 weeks of one year. Section 105.6 of the Act, 77 P.S. § 25.6.[9] Thus, herein, the employer had to prove that claimant sustained a hearing loss independent of the work environment, or that claimant was not exposed to long-term hazardous noise levels. Here, the WCJ rejected employer's affirmative defense, and we conclude that the WCJ's findings are supported by substantial evidence.

■ Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Elliott Co. v. Workers' Compensation Appeal Board (Shipley)*, 795 A.2d 480 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 569 Pa. 710, 805 A.2d 526 (2002) (citing *Hoffmaster v. Workers' Compensation Appeal Board (Senco Products)*, 721 A.2d 1152 (Pa. Cmwlth.1998)). In reviewing for substantial evidence, the Court looks at the evidence in a light most favorable to the party who prevailed before the fact finder, and draws all reasonable inferences deducible from the evidence in support of the fact finder's decision. *Elliott Co.* Where both parties present evidence before the fact finder, the inquiry is whether there is evidence to support the findings of the WCJ. *Id.* It is solely for the WCJ, as the fact finder, to assess credibility and to resolve conflicts in the evidence. *Id.* It is solely for the WCJ, as fact finder, to determine the weight to give the evidence. *Id.* The WCJ may reject the testimony of any witness in whole or in part, even if that testimony is uncontradicted. *Id.*

■ Here, the WCJ rejected Dr. Thornton's study on the basis that the study did not reflect claimant's exposure while working in the Quick Action Department. (WCJ's Finding of Fact No. 33.) The WCJ specifically noted that Dr. Thornton's study did not reflect the level of noise when specific events occurred, e.g., steam leaks, powerhouse boilers operating, valve leaks. The WCJ also noted that Dr. Thornton's findings regarding the steam leaks of 2002 was unpersuasive because the readings were sound level readings rather than full shift readings. The WCJ further noted that the personal dosimetry was taken while the powerhouse boilers were operating, but that the report failed to indicate whether product testing was being performed. This is significant, as claimant's testimony was that differing products caused an increase in the noise levels. The WCJ was free to accept the evidence offered by employer. The WCJ did not in many respects because the WCJ opined that the evidence gathered and submitted did not accurately reflect and measure the noise levels in claimant's work environment.

The evidence offered by claimant in the form of claimant's own testimony and that of his medical expert, Dr. Bell, was found credible. That evidence established that claimant was exposed to long term hazardous noise that resulted in a greater than 10% hearing loss. The Board committed no error in concluding that there was substantial evidence of record to support the findings of the WCJ.

Moreover, the WCJ did not misapply 29 C.F.R. § 1910.95. Employer's argument

---

9. Sections 105.4 and 105.6 were added by Section 1 of the Act of February 23, 1995, P.L. 1.

is essentially an attack on the WCJ's rejection of employer's evidence. Here, the WCJ was not persuaded with a dosimeter reading, and the WCJ explained that the reason for the skepticism was that the reading was not reflective of claimant's work environment. It is black letter law that the rejection of specific evidence, the weight to be accorded evidence, and resolution of the conflicts in evidence, are all within the WCJ's exclusive province as fact finder. *Wheeling–Pittsburgh Steel Corp. v. Workers' Compensation Appeal Board (Sesco),* 828 A.2d 1189 (Pa.Cmwlth.2003), *petition for allowance of appeal denied,* 581 Pa. 694, 864 A.2d 531 (2004). We find no error in the Board's review of the WJC's decision on this issue.

The final issue raised is whether the Board erred in affirming the WCJ's calculation of the AWW pursuant to Section 309(d.1) of the Act, 77 P.S. § 582(d.1), rather than pursuant to Section 309(d) of the Act, 77 P.S. § 582(d). We conclude the Board erred in part.

The WCJ found that there was not a continuing relationship between employer and employee. (WCJ's Finding of Fact No. 45.) Accordingly, the WCJ calculated claimant's AWW pursuant to Section 309(d.1) of the Act, 77 P.S. § 582(d.1). The Board did not agree *in toto.* The Board concluded that the WCJ erred in her conclusion regarding the employment relationship. However, the Board concluded that while a continuing employment relationship existed between claimant and employer, nonetheless, the WCJ properly calculated claimant's AWW pursuant to Section 309(d.1) of the Act, 77 P.S. § 582(d.1). We agree with the Board regarding the existence of an employment relationship but disagree regarding the calculation of the AWW. First, we address the employment relationship.

Section 309 of the Act provides, in relevant part, that:

(d) If at the time of the injury the wages are fixed by any manner not enumerated in clause (a), (b) or (c), the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

(d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

77 P.S. § 582(d), (d.1). The relevant focus is on the term "employ." *Reifsnyder,* 584 Pa. 341, 358, 883 A.2d 537, 547.

The term "employ" or "employed" is not limited to actual days an employee performs work, but encompasses the period of time that an employment relationship is maintained between the parties. *Port Authority of Allegheny County v. Workers' Compensation Appeal Board (Cooley),* 773 A.2d 224 (Pa.Cmwlth. 2001), (citing *Triangle Bldg. Ctr. v. Workers' Compensation Appeal Board (Linch),* 560 Pa. 540, 746 A.2d 1108 (2000)); *Frank M. Sheesley Co. v. Workmen's Compensation Appeal Board (Brant),* 106 Pa. Cmwlth.227, 526 A.2d 450 (1987). In each case, the critical fact that determines whether there is an employment relationship is whether there is the communication

between employer and the claimant. *Accord, Reifsnyder.*

■ Here, the evidence is that for the first quarter, February 26, 2001 through May 26, 2001, claimant worked ten of the thirteen weeks as he was voluntarily laid off for three weeks. In the second quarter, May 26, 2001 through August 26, 2001, claimant worked five of the thirteen weeks, as he was voluntarily laid off for eight consecutive weeks. Claimant worked the entire third and fourth quarters prior to his injury. Claimant testified that he accepted the lay off in part because it meant that younger employees were not laid off. (Notes of Testimony, January 15, 2003, pp. 32–37.) Claimant's testimony is that he is offered the choice of whether to accept a layoff, and the choice is offered based on seniority. (Notes of Testimony, January 15, 2003, pp. 31–33.) That testimony evidences a continuing employer/employee relationship, and based on that relationship, i.e., seniority, claimant decides whether or not to work. That testimony, standing alone, supports a finding that an employment relationship is maintained.

There being a continuing relationship between employer and claimant, the next issue focuses on the calculation of claimant's wages. The term "wages" is defined by the Act as the claimant's average weekly wage at the time of the injury. Section 309 of the Act, 77 P.S. § 582. When a claimant's wages are not fixed by the week, month, or year, the average weekly wage must be calculated under one of three sections: Section 309(d), (d.1) or (d.2). *Reifsnyder.*

Section 309(d) and subsections (d.1) and (d.2) address progressively shorter employment relationships: (d.1) governs employees employed for at least one, but less than three consecutive periods of thirteen calendar weeks; while (d.2) addresses cases of recent hires, *i.e.*, employees who worked less than a single complete period of thirteen calendar weeks at the time they suffered a work injury.

. . . .

Both (d) and (d.1) include look-back periods encompassing the preceding fifty-two weeks, in search of "completed" thirteen-week periods; in contrast, section (d.2) has no such long-term focus. . . .

*Reifsnyder,* 883 A.2d at 546.

■ Section 309(d) is used if the claimant is in employer's employ whereas Section 309(d.1) is used if the claimant is not within the employer's employ. *Id.; Colpetzer v. Workers' Compensation Appeal Board (Standard Steel),* 582 Pa. 295, 870 A.2d 875 (2005); *Zerby v. Workers' Compensation Appeal Board (Reading Anthracite Co.),* 821 A.2d 193 (Pa.Cmwlth.), *petition for allowance of appeal granted,* 574 Pa. 146, 829 A.2d 297 (2003). Here, claimant was a long-term employee of employer who maintained his employment relationship in the four quarters preceding his disability. The calculation of the AWW should have been done pursuant to Section 309(d) of the Act, 77 P.S. § 582(d), and the Board erred in concluding otherwise.[10] We so conclude, as the evidence establishes that the employment relationship was intact and that claimant worked four quarters in the period preceding his disability. *Reifsnyder,* 883 A.2d at 548. A calculation pursuant to Section 309(d) of the Act, 77 P.S. § 582(d), will provide a benefit that reflects "a reasonable picture of a claimant's pre-injury earning experi-

---

**10.** Section 309(d.2) of the Act is not applicable as there is no assertion that claimant did not have fixed weekly wages.

ence for use as a projection of potential future wages ...." *Norton v. Workers' Compensation Appeal Board (Max Norton)*, 764 A.2d 704, 707 (Pa.Cmwlth.2000), (quoting *Triangle Building Center*, 560 Pa. at 548–49, 746 A.2d at 1112–1113 (2000)); *accord, Reifsnyder*; *Hannaberry HVAC v. Workers' Compensation Appeal Board (Snyder)*, 575 Pa. 66, 834 A.2d 524 (2003). This conclusion is consistent with "the Act 57 amendments which have reduced the pro-claimant nature of the AWW calculation." *Port Authority*, 773 A.2d at 229; *accord Reifsnyder*; *Hannaberry*. The purpose of Section 309(d) is "to accurately capture economic reality." *Reifsnyder*, 883 A.2d at 548.

Accordingly, this Court vacates that part of the Order of the Workers' Compensation Appeal Board that affirmed the WCJ's conclusion that a continuing employment relationship did exist between employer and claimant, and vacates the calculation of claimant's AWW based upon Section 309(d.1) of the Act, 77 P.S. Section 582(d.1); the matter is remanded to the Board with direction that it be remanded to the WCJ forthwith for a recalculation of claimant's AWW pursuant to Section 309(d) of the Act, 77 P.S. Section 582(d); and further, in all other respects the Order of the Board is AFFIRMED.

### ORDER

AND NOW, this 2nd day of May, 2006, this Court vacates that part of the Order of the Workers' Compensation Appeal Board that affirmed the WCJ's conclusion that a continuing employment relationship did exist between employer and claimant, and vacates the calculation of claimant's AWW based upon Section 309(d.1) of the Act, 77 P.S. Section 582(d.1); the matter is remanded to the Board with direction that it be remanded to the WCJ forthwith for a recalculation of claimant's AWW pursuant

to Section 309(d) of the Act, 77 P.S. Section 582(d); and further, in all other respects the Order of the Board is AFFIRMED.

Jurisdiction relinquished.