**Gregory PIKE, Petitioner**

**v.**

**WORKERS' COMPENSATION APPEAL BOARD (VESELEY BROTHERS MOVING), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 12, 2010.
Decided May 23, 2011.
Reargument Denied July 13, 2011.

James C. Ward, Pittsburgh, for petitioner.

Dale A. Cable, Pittsburgh, for respondent Veseley Brothers Moving.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and BUTLER, Judge.

OPINION BY Judge COHN JUBELIRER.

Gregory Pike (Claimant) petitions this Court for review of the May 25, 2010, Order of the Workers' Compensation Appeal Board (Board), incorporating its Opinion and Order dated December 29, 2008, that, *inter alia,* affirmed the WCJ's determination of Claimant's average weekly wage (AWW) pursuant to Section 309(d) of the Workers' Compensation Act (Act).[1] Claimant contends that the Board erred in affirming the WCJ's determination of Claimant's AWW by: (1) including substantially lower earnings from periods before Claimant received a promotion to a much higher paying position; and (2) subtracting all the expenses Claimant listed on his 2004 federal income tax return (tax return), such as depreciation and home office business use deductions, rather than only those expenses actually paid.

The WCJ made the following relevant Findings of Fact with relation to the calculation of Claimant's AWW:

1. The Claimant, Gregory Pike, sustained a low back injury during the course of his employment with Vesel[e]y Brothers Moving and Storage (Employer) on October 28, 2004. The Notice of Compensation Payable that was issued concerning the claimant's work injury of October 28, 2004, reflects that the claimant's pre-injury average weekly wage was $458.00 and that the total disability compensation rate applicable to the work injury of October 28, 2004 is $337.50 per week. An Amended Notice of Compensation Payable was issued in this matter on December 9, 2004. Then a second

---

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 582(d).

Amended Notice of Compensation Payable was issued on January 10, 2005. The second Amended Notice of Compensation Payable reflects that the claimant's pre-injury average weekly wage was $625.67 and that the total disability compensation rate applicable to the claimant's work injury of October 28, 2004 is $417.11 per week.

2. In June, 2005, the employer filed a Statement of Wages with the Bureau of Workers' Compensation in Harrisburg, PA. The Statement of Wages lists the claimant's pre-injury average weekly wage as being $1,427.43

3. In February, 2006, the claimant, Gregory Pike, filed a Petition to Review Compensation Benefits in which he alleged that the employer had incorrectly calculated his average weekly wage.

. . . .

20. The claimant, Gregory Pike, testified at the hearing held in this matter on May 11, 2006.

. . .

The claimant testified that he started working for Employer in June, 2003. He said that his first job with Employer was as a warehouse worker/laborer. . . . He also testified that, as a warehouse worker/laborer, he was paid at the rate of $8.50 an hour. The claimant testified that his position with Employer changed as of August 1, 2004. As of that date, according to the claimant, he became a Class A certified driver for United Van Lines through Employer.

The claimant indicated that, as a Class A certified driver, rather than being paid at an hourly wage rate, he was paid a percentage of the total value of the job. The claimant acknowledged that he was given a sum of money for a job, and after the expenses were deducted, the amount left over was his income. The claimant testified that the percentage he was paid and the amount of expenses he incurred varied from job to job.

. . . .

23. The claimant also testified at the hearing held in this case on June 14, 2007. The claimant verified that when he filed his 2004 tax return, he took various deductions. The claimant confirmed that one of those deductions was for depreciation for the truck he used for business. The claimant testified that he obtained the right to use that truck through a lease agreement with Employer. The claimant said he entered into the lease agreement with Vesel[e]y's on August 1, 2004, and that it was a one-year lease agreement.

The claimant testified that he also took a deduction for the business use of his home. He testified that he started using his home for some business purposes after August 1, 2004 and stopped using his home for any business purpose some time in 2005. The claimant testified that the new job he started with Employer as of August 1, 2004 was a permanent position. The claimant said, "The only thing that stopped it was my injury." During cross-examination, the claimant stated that the truck that was depreciated was a 1991 Freightliner. The claimant explained that he was to make lease payments on the truck for one year and, at the end of the lease term, the buy-out fee would be zero. The claimant testified that the lease payments were approximately $505.00 per month. The claimant said that he made the lease payments for the months of August, September, and

October. Then, according to the claimant, he turned the truck back to Employer because he could not afford the payments.

The claimant testified that whenever he got gas for the truck and paid tolls, he used a company credit card and those expenses were taken out of his commission.

The claimant also testified that he bought six tires for the truck and the tire expenses were also deducted from his commission.

The claimant testified that, prior to his work injury, he did some work-related paperwork and computer work in his office at home.

. . . .

39. Based upon my review and consideration of all of the evidence of record, I find that the correct average weekly wage applicable to the work injury Gregory Pike sustained on October 28, 2004 is $744.64. I further find that the correct total disability compensation rate applicable in this matter is $496.67 per week.

In reaching these particular determinations, I note that every wage statement and proposed wage statement that has been submitted into the record in this matter reflects that the claimant's average weekly wage for the second thirteen-week period during the 52 weeks immediately prior to the claimant's work injury of October 28, 2004 was $306.23. In addition, every statement of wages and proposed statement of wages that has been submitted into the record reflects that the claimant's average weekly wage during the third thirteen-week period during the 52 weeks immediately prior to the claimant's work injury of October 28, 2004 was $368.15. Accordingly, there does not

appear to be a dispute concerning the claimant's average weekly wage for those two thirteen week periods. So, I have used those average weekly wage figures in my calculations.

I find that the crux of the average weekly wage calculation issue in this case is the issue as to what should be considered the claimant's average weekly wage for the fourth period of thirteen weeks during the 52–week period immediately prior to the claimant's work injury of October 28, 2004. As is about to be explained, I have calculated the claimant's average weekly wage for the fourth period of 13–weeks to be $1,559.54.

In reaching the figure of $1,559.54, I have taken the claimant's gross earnings of $50,150.00 as reported on the 1099 he was issued for 2004 and from those gross earnings, I have deducted $29,876.00. The $29,876.00 represents the total amount Mr. Pike claimed as business expenses on the Schedule C that was filed with his 2004 income tax return, including the $596.00 expense he claimed for the business use of his home. After subtracting $29,876.00 in claimed business expenses from the claimant's total gross earnings of $50,150.00, I have arrived at a difference of $20,274.00. I have divided the $20,274.00 by 13 to arrive at an average weekly wage figure of $1,559.54 for the fourth period of thirteen weeks during the 52–week period immediately prior to the claimant's work injury of October 28, 2004.

In order to complete my calculations, I have added together the claimant's average weekly wages for the second period ($306.23), third period ($368.15) and fourth period ($1,559.54) and arrived at a total of $2,233.92. I then

divided this sum by three and arrived at an average weekly wage of $744.64 and a resulting total disability compensation rate of $496.67.

I fully recognize that the claimant has tried to maintain that some of the business expenses he declared for deductions on his 2004 tax return should actually be added back onto his income for purposes of calculating his pre-injury average weekly wage. Specifically, the claimant has maintained that at least part of the depreciation deduction he took and the expenses he declared for the business use of his home, should be added back to his income for purposes of his average weekly wage calculation. There is, however, no evidence in the record that suggests that the claimant has ever filed an amended tax return for the year of 2004 recanting entitlement to any of the business expenses he declared.... Furthermore, in light of the fact that there is no indication that the claimant has filed any type of amended income tax return for the year 2004, I find that the claimant is bound by the decisions that he and his accountant made to declare business expense deduction that limited his tax liability even though those decisions and deductions have resulted in a lower average weekly wage calculation.

I also fully recognize that the claimant has argued that, pursuant to the principles espoused in the Pennsylvania Supreme Court's decision in *Hannaberry HVAC v. [ Workers' Compensation Appeal Board (Snyder Jr.),* 575 Pa. 66, 834 A.2d 524 (2003) ], it would be a more accurate reflection of the wage loss he has sustained to only consider the wages he earned as a Class A certified driver between August 1, 2004 and the date of his injury, for purposes of calculating the average weekly wage and compensation rate applicable to his work injury of October 28 2004. I am, however, hesitant to apply the *Hannaberry* decision to Mr. Pike's situation because[,] in the *Hannaberry* case, the claimant went from a part-time employment situation to a permanent full-time employment situation and Mr. Pike's case does not involve any part-time/ full-time issues. In addition, based upon the evidence that has been presented to me in this matter, I am unable to tell whether the earnings the claimant had as a Class A certified driver from August 1, 2004 through the date of his injury were representative of wages the claimant had a reasonable expectation of making throughout the year as a Class A certified driver or if, for some reason, they were higher or lower than what could be reasonably anticipated for other times of the year. Accordingly, I must conclude that there is not enough evidence of record for me to assume that if Mr. Pike continued to work as a Class A certified driver, he would have continued to have quarterly earnings equal to the earnings he had during the August 1, 2004 through October 28, 2004 time period.

(WCJ Decision, April 15, 2008, Findings of Fact (FOF) ¶¶ 1–3, 20, 23, 39.) In sum, the WCJ calculated Claimant's AWW by dividing by thirteen the total wages earned in the employ of Employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods. This was the method prescribed by Section

309(d) of the Act. 77 P.S. § 582(d).[2] Further, the WCJ relied upon Claimant's tax return for the amounts he subtracted for business expenses in order to arrive at his net income for purposes of his AWW calculations. The WCJ did not add back into Claimant's income those amounts he deducted for the depreciation or home office business use deductions because Claimant did not file an amended return and he was thereby bound by the tax return as filed.

Claimant appealed to the Board, which affirmed the WCJ's calculation of the AWW, concluding that "the WCJ committed no error in failing to apply *Hannaberry*" (Board Op. at 4), because: (1) Claimant's present matter does not involve the transition from part-time to full-time employment as in *Hannaberry*; and (2) "the WCJ found that the evidence did not establish that the earnings Claimant had from August 1, 2004 through October 28, 2004 were representative of wages Claimant had a reasonable expectation of making throughout the year." (Board Op. at 4; FOF ¶ 39.) Additionally, the Board agreed with the WCJ's determination that Claimant was bound by the tax return he had filed and that, therefore, the deductions Claimant took on his tax return for business expenses for the depreciation of Employer's truck and Claimant's home office business use should be subtracted from his total gross earnings for purposes

of the AWW calculation.[3] (Board Op. at 4–5.) The Board also affirmed that the depreciation and home office business use deductions were properly subtracted from Claimant's gross income to arrive at net income for purposes of the AWW calculation because "there was no evidence in the record that the claimant has ever filed an amended tax return for the year 2004 recanting entitlement to any of the business expenses he declared" and he was "bound by the actual return." (Board Op. at 5 (quoting FOF ¶ 39).)

■ Claimant now appeals to this Court.[4] Before this Court, Claimant argues that the Board erred by: (1) failing to apply the principles of *Hannaberry* and calculate Claimant's AWW based on the quarter most reflective of Claimant's new economic reality given his promotion; and (2) failing to add back to income, for purposes of the AWW calculations, the depreciation and home office business use deductions Claimant had subtracted from his income on the tax return from his fourth period commission earnings.

■ We first address Claimant's argument that the Board erred by failing to apply *Hannaberry* when determining his AWW. Claimant contends that his change in jobs with Employer on August 1, 2004, from a warehouse laborer paid at an hour-

2. Section 309(d) of the Act provides in relevant part:

the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

77 P.S. § 582(d).

3. We note that both Claimant and Employer had filed numerous other petitions in addition

to those now before this Court, that were addressed by the Board in two appeals and by the WCJ on remand that are no longer at issue in this appeal.

4. "This Court's scope of review is limited to determining whether the WCJ's necessary findings of fact are supported by substantial evidence or whether an error of law or a constitutional violation occurred." *Colpetzer v. Workers' Compensation Appeal Board (Standard Steel)*, 802 A.2d 1233, 1235 n. 4 (Pa. Cmwlth.2002).

ly rate to a commissioned certified driver, resulted in such a significant change in compensation and that a failure to apply *Hannaberry* results in an inaccurate reflection of the income Claimant expected to earn had he not been injured. Because the WCJ found that the AWW for each of the three periods were $306.23, $368.15 and $1,559.54 respectively, (FOF ¶ 39), Claimant maintains that in order to provide the most accurate reflection of his earnings and what he expected to continue to earn had he not been injured, *Hannaberry* requires Section 309(d.1) to be applied, rather than Section 309(d).

The Act establishes statutory formulas which are to be applied in calculating a claimant's AWW. For those employees who do not receive fixed weekly, monthly, or yearly wages, Section 309 provides that the AWW is to be calculated as follows:

(d) ... the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer in each of the highest three of the last four consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury and by averaging the total amounts earned during these three periods.

(d.1) If the employe has not been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury, the average weekly wage shall be calculated by dividing by thirteen the total wages earned in the employ of the employer for any completed period of thirteen calendar weeks immediately preceding the injury and by averaging the total amounts earned during such periods.

(d.2) If the employe has worked less than a complete period of thirteen calendar weeks and does not have fixed weekly wages, the average weekly wage shall be the hourly wage rate multiplied by the number of hours the employe was expected to work per week under the terms of employment.

77 P.S. § 582(d)-(d.2). Because Claimant had been employed by Employer for more than fifty-two consecutive weeks, the WCJ properly applied Section 309(d).

Claimant's employment history with Employer places him within Section 309(d). Claimant worked for Employer for more than three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury. Claimant testified that he began working for Employer in June 2003 at an hourly wage until he became a certified driver with Employer on August 1, 2004, whereupon he was paid a commission. (Claimant Dep. at 15–17, R.R. at 53a–55a.) By its terms, Section 309(d.1) applies only if Claimant "has *not* been employed by the employer for at least three consecutive periods of thirteen calendar weeks in the fifty-two weeks immediately preceding the injury." 77 P.S. § 582(d.1) (emphasis added).

Claimant argues that Section 309(d) should be disregarded and, instead, Section 309(d.1) should be applied in accordance with the principles of *Hannaberry* since, in his view, to do otherwise would not provide an accurate reflection of his earnings. In *Hannaberry*, the claimant had worked on a part-time basis for his employer while he was in high school. After graduating, he began to work full-time for the same employer, at wages more than four times what he had earned as a student. The claimant was tragically rendered quadriplegic when a forklift fell on him while at work. The Supreme Court held that Section 309(d) did not address the economic reality of a worker who transitioned from part-time to full-time work before becoming disabled and that the in-

tention of the Act, as amended by the Act of June 24, 1996, P.L. 350 (Act 57), was to provide a fair ascertainment of wages that would more accurately reflect the hourly worker's true wages. *Hannaberry*, 575 Pa. at 80–82, 834 A.2d at 532–33. The Supreme Court stated that, in that circumstance, the WCJ properly calculated the AWW solely on the basis of the claimant's final period of wages. *Id.* at 80, 834 A.2d at 532. The Court stated that "Section [309] as a whole obviously is designed to ensure an **accurate** calculation of wages" and, "in the case of recently hired workers, the statute permits a **projection** based upon the number of hours the employee was 'expected' to work." *Id.* (quoting 77 P.S. § 582(d.2)) (emphasis in original). Therefore, "subsection (d) does not control the calculation in a circumstance where it would lead to a grossly and demonstrably inaccurate measure of a worker's weekly wage." *Id.* at 82–83, 834 A.2d at 534.

Claimant argues that Section 309(d) leads to "a grossly and demonstrably inaccurate measure" of his weekly wage in his case, because it averages the two earlier periods of earnings as a laborer with his substantially higher fourth period commission earnings and the average of these very different amounts does not provide the most accurate reflection of his earnings or what he expected to continue to earn had he not been injured. (Claimant's Br. at 18.) Therefore, he contends, his circumstance falls within *Hannaberry*.

It is true that Claimant earned significantly less during two of the relevant thirteen-week periods ($306.23 and $368.15) as compared with the last period ($1,559.54). However, we do not believe this earnings disparity, although significant, necessarily renders Section 309(d) inapplicable in this case. We come to this conclusion for a number of reasons.

First, the plain language of Section 309(d) compels us to apply this section to the facts of this case. The averaging required by Section 309(d) was enacted when Act 57 became law. These amendments in Act 57 "rewrote subsec[tions] (d) and (e), inserted subsec[tions] (d.1) and (d.2)" and, thereby, eliminated a former statutory option that permitted the employee to elect the highest income thirteen-week period as the basis for the AWW calculations. 77 P.S. § 582, Annotation, Historical and Statutory Notes; *See also Triangle Building Center v. Workers' Compensation Appeal Board (Linch)*, 560 Pa. 540, 548 n. 4, 746 A.2d 1108, 1112 n. 4 (2000) (noting that the amended Section 309(d) has "[t]he effect of substituting an overall average for selection of the thirteen-week period yielding the highest wage figure ... [, which] lessen[s], to a degree, the employee-favored aspect of the calculation.") The fact that a former provision of the Act that permitted an employee to select the highest income period as the basis for the AWW calculation, which is the effect of Claimant's request here, was specifically *removed* by the Act 57 amendments, supports our understanding that we cannot avoid applying the statutory formula for the AWW calculation in this case.

The Courts of this Commonwealth have been presented on occasion with cases in which claimants argue for the elimination of certain periods of low or no earnings during their employment before their work injuries. For example, in *Reifsnyder v. Workers' Compensation Appeal Board (Dana Corporation)*, 584 Pa. 341, 883 A.2d 537 (2005), three claimants were long-term employees, but had been subject to periodic layoffs prior to their injuries. Because of the periodic layoffs, and despite the fact that they were longtime employees, the claimants argued that their AWW should be calculated pursuant to Section 309(d.2) because they did not earn wages for any

single consecutive period of thirteen weeks. The Supreme Court stated that "[t]he structure of the statute strongly indicates that subsection (d.2) was not intended to apply to employees ... with long-term employment relationships with their employer who happen to have been subject to layoffs." *Id.* at 356, 883 A.2d at 546. The Supreme Court further stated that

> (d.2) contemplates persons for whom there is little work history with the employer upon which to calculate the AWW. Viewing the interrelationship of these subsections, we deem it unlikely in the extreme that the General Assembly intended (d.2) to supplant (d) or (d.1) anytime a long-term employment relationship happens to involve periods with a "work" cessation.

*Id.* at 357, 883 A.2d at 547. Later, in *Burkhart Refractory Installation v. Workers' Compensation Appeal Board (Christ)*, 896 A.2d 9 (Pa.Cmwlth.2006), this Court summarized the discussion in *Reifsnyder* and concluded that "subsections (d) and (d.1) apply to claimants with long-term employment relationships because they 'look back' to the previous fifty-two weeks of employment." *Burkhart*, 896 A.2d at 12. However, "[i]n contrast, (d.2) applies to recently hired employees because it 'looks forward.'" *Id.* Therefore, relying upon the Supreme Court's conclusions in *Reifsnyder*, this Court surmised that subsection (d.2) applies only to prospective calculations. *Burkhart*, 896 A.2d at 12 (citing *Reifsnyder*, 584 Pa. at 356–57, 883 A.2d at 546–47). In *Burkhart*, although the claimant was employed for sixteen weeks, he actually earned wages only during twelve of those weeks and, therefore, we did not apply Section 309(d.1) because claimant was not a long-term employee for whom a look-back period was appropriate. *Id.* at 12–13. In the case now before us, Claimant is clearly a long-term employee.

■ Second, we are constrained to apply Section 309(d) based on the record in this case. The WCJ did not find sufficient evidence of record from which to conclude, with any degree of certainty, that Claimant's fourth period earnings as a commissioned certified driver were indicative of what he would have earned had he not been injured. (FOF ¶ 39.) Claimant's earnings as a commissioned driver were percentages of jobs and varied subject to the availability and frequency of such jobs, as well as the size of a particular job. (Hr'g Tr. at 16–18, R.R. at 54a–56a.) On direct examination, Claimant stated that he received a percentage of the total value of the job and that percentage could depend on the weight of the truck load:

> It paid sometimes on weight. There was a lot of different ways. Actually it was a percentage. On the average I was getting fifty-three percent of the delivery cost and other items that were involved, packing materials, unpacking materials. It basically was fifty-three percent.

(Hr'g Tr. at 17, May 11, 2006, R.R. at 55a.) Importantly, the WCJ made no factual finding in this case that Claimant's fourth period earnings were demonstrative of future earnings. To the contrary, the WCJ stated that she was

> unable to tell whether the earnings the claimant had as a Class A certified driver from August 1, 2004 through the date of his injury were representative of wages the claimant had a reasonable expectation of making throughout the year as a Class A certified driver or if, for some reason, they were higher or lower than what could be reasonably anticipated for other times of the year. Accordingly, I must conclude that there is not enough evidence of record for me to assume that if [Claimant] continued to

work as a Class A certified driver, he would have continued to have quarterly earnings equal to the earnings he had during the August 1, 2004 through [fourth] period.

(FOF ¶ 39.) In reviewing the record, we agree with the WCJ that there is no evidence about what a Class A certified driver working for Employer typically earned in commissions, or whether Claimant's earnings for that period were indicative of what he would have received as commissions during other periods of the year. Moreover, "the employee bears the burden of establishing a right to compensation and of proving all necessary elements to support an award." *Inglis House v. Workers' Compensation Appeal Board (Reedy)*, 535 Pa. 135, 141, 634 A.2d 592, 595 (1993). We, therefore, cannot say that the WCJ's conclusion is incorrect. Thus, we conclude that the WCJ did not err in applying Section 309(d) to calculate Claimant's AWW.

■ Next, Claimant argues that the WCJ improperly subtracted Claimant's tax return deductions of $4,200 in depreciation and $596.00 for home office business use, thereby artificially lowering his earnings. Claimant contends that this Court's decision in *Nortim, Inc. v. Workmen's Compensation Appeal Board (Rolick)*, 150 Pa. Cmwlth.196, 615 A.2d 873 (1992), requires that only out-of-pocket expenses actually paid in the specific quarter under review should be subtracted from Claimant's income. Claimant asserts that his depreciation and home office business use deductions were neither actually paid in the specific quarter under review nor were they actual, out-of-pocket expenses. For these reasons, Claimant asserts that these deductions should not be subtracted from his commission income for the relevant quarter.

In *Nortim*, the employee was a logging contractor, and received wages based on his production output. The claimant paid his business expenses from the remuneration he received from his employer based on that output. The employer appealed the AWW calculation, *inter alia*, because certain interest, legal and professional expenses alleged to have been incurred by the claimant were not deducted in arriving at and, therefore, reducing net earnings. However, other business expenses incurred by the employee for fuel, maintenance, *depreciation*, and repair of equipment had already been subtracted and were not the subject of employer's appeal. *Id.* at 875. Thus, this Court affirmed the subtraction of the other business expenses, concluding that the referee's[5] calculations were supported by substantial evidence. *Id.* at 876. However, regarding the employer's claim that the interest, legal, and professional expenses should also have been subtracted to arrive at a decreased sum for total wages, this Court stated that "the record does not contain substantial evidence to establish that [c]laimant actually paid these expenses in [the relevant] quarter" and, therefore, "the referee properly excluded these expenses from the wage computation." *Id.* at 876 n. 3.

■ We draw attention to the fact that, in *Nortim*, this Court affirmed the subtraction of depreciation from commission earnings as a properly subtracted actual expense to arrive at net earnings. *Id.* at 876. In doing so, we first reviewed Section 309(e) of the Act. This section provides for what is included and excluded by

5. "Workers' Compensation Judges were known as referees prior to the amendments to Section 401 of the Act, 77 P.S. § 701, effective August 31, 1993." *Conaway v. Workers' Compensation Appeal Board (City of Philadelphia)*, 728 A.2d 1037, 1038 n. 3 (Pa.Cmwlth. 1999).

the terms "average weekly wage" and "total wages:"

> The terms "average weekly wage" and "total wages," as used in this section, shall include board and lodging received from the employer, and gratuities reported to the United States Internal Revenue Service by or for the employe for Federal income tax purposes, but such terms shall not include amounts deducted by the employer under the contract of hiring for labor furnished or paid for by the employer and necessary for the performance of such contract by the employe, nor shall such terms include deductions from wages due the employer for rent and supplies necessary for the employe's use in the performance of his labor.

77 P.S. § 582(e). Before calculating the AWW under the Act, the WCJ must first determine "total wages" for any relevant quarter. 77 P.S. § 582. However, the Act does not contain a definition for the term "wages," but that term is "generally recognized as compensation given to a hired person for his or her services, based on time worked or output of production." *Mullen v. Workers' Compensation Appeal Board (Mullen's Truck & Auto Repair)*, 945 A.2d 813, 818 (Pa.Cmwlth.2008). In the instant case, for the quarter at issue, Claimant was paid commissions on a percentage basis for each job, as opposed to set wages, and consequently was required to pay his expenses from those commissions. Therefore, Claimant must first establish his net business income from his commissions in order for the WCJ to arrive at "total wages" for purposes of the AWW calculation. 77 P.S. § 582. This Court has previously determined that a claimant's business income is limited to his net profits as shown on his tax return. *Mullen*, 945 A.2d at 820. Here, to establish his net profits for the relevant quarter, Claimant produced his tax return. The

tax return listed his net earnings as $20,274. (Tax Return at 1, R.R. at 243a.) Additionally, Claimant presented the testimony of his accountant, Brian G. Pirilla, CPA, Esq., who prepared Claimant's tax return. He explained that Claimant's gross receipts were $50,150 and that Claimant's 2004 net taxable business income (from Schedule C of the tax return) was listed on his tax return as being $20,274. (Pirilla Dep. at 30, R.R. at 225a.) Claimant also testified on direct examination that his commissions from Employer were based upon a percentage of each job, he incurred expenses for those jobs and, after expenses, the income left over was his. (Hr'g Tr. at 17, R.R. at 55a.) Upon direct examination of Claimant, the following exchange occurred:

> Q. Then I see you have business expenses and what do those total?
>
> A. It would be twenty thousand eight hundred and seventy dollars.
>
> Q. What was your net income in 2004?
>
> A. Twenty-thousand two hundred seventy-four dollars.

(Hr'g Tr. at 24, R.R. at 62a.) Thus, Claimant himself stated that his net income was $20,274. This net income reflected the subtraction of the depreciation expense of $4,200 and the home office business expense of $596.00. Because Claimant, himself, established his expenses in arriving at his business income on his tax return, produced this tax return as evidence of his business income, and did not produce additional evidence before the WCJ to show why his net income should be increased by excluding the depreciation deductions at issue, the WCJ did not err in her calculations by relying upon Claimant's tax return.

In support of its position that these depreciation expenses must remain subtracted from gross earnings for purposes of the

AWW calculations, Employer presented the deposition testimony and report of a forensic accountant, James S. Fellin, C.P.A. Mr. Fellin stated that there was no reasonable basis for the proposed adjustments that Claimant wanted to make. (Fellin Dep. at 8, R.R. at 320a.) When asked whether Claimant could add back to his income the amount of $4,200 in depreciation that he deducted on Schedule C of his Tax Return, Mr. Fellin stated that "when he signed the return, he was saying that was his true income from the business. Now, he's coming back and contradicting his statement ... that he made when he signed off on that return back in 2004." (Fellin Dep. at 11, R.R. at 321a.) He further stated that "it's my understanding that there's no evidence at all that's been provided that would substantiate any changes in a return." (Fellin Dep. at 12, R.R. at 321a.) Mr. Fellin also testified that the home office business use deduction taken by Claimant is a legitimate business expense because the government has recognized that one incurs "legitimate costs associated with having your business in your house, and so we are allowing you to deduct the portioned share of those costs that relate to the area used exclusively for your business." (Fellin Dep. at 19, R.R. at 323a.) Mr. Fellin's report provides further support and documentation that these two business deductions, depreciation and home office business use, should not be added back to Claimant's income because they are legitimate business expenses and Claimant has not provided any evidence to substantiate any proposed reductions. (Report, May 10, 2007, 1–10; R.R. at 336a–345a.)

The WCJ summarized her findings upon Mr. Fellin's deposition testimony on this issue, in relevant part, as follows:

Mr. Fellin testified that he has reviewed the claimant's tax return for the year of 2004. He further testified that the business deductions set forth on Schedule C of that tax return were legitimate business deductions. Moreover, Mr. Fellin maintained that no adjustments should be made on the reported net income for Mr. Pike for 2004.

. . . .

Mr. Fellin maintained that he has not seen any documentation or other evidence which would substantiate any changes in the business expense deductions claimed on the claimant's 2004 tax return. He further maintained that some of the adjustments that the claimant has proposed should be made to his tax return, such as adding back the amount that was depreciated for his truck, or adding back the amount he claimed for the business use of his home, are not supported by federal tax law or by any accounting principles.

(FOF ¶ 37.) After reviewing the relevant testimony and depositions, Mr. Fellin's report, and Claimant's Tax Return on this issue, the WCJ determined that the tax return supported the net income reported on line 12 of Form 1040 in the amount of $20,274. This is the sum she used for the basis of the calculations of AWW for the relevant periods for Claimant. The WCJ arrived at the calculations as follows:

In reaching the figure of $1,559.54, I have taken the claimant's gross earnings of $50,150.00, as reported on the 1099 he was issued for 2004 and from those gross earnings, I have deducted $29,876.00. The $29,876.00 represents the total amount Mr. Pike claimed as business expenses on the Schedule C that was filed with his 2004 income tax return, including the $596.00 expense he claimed for the business use of his home. After subtracting $29,876.00 in claimed business expenses from the claimant's total gross earnings of $50,150.00, I have

arrived at a difference of $20,274.00. I have divided the $20,274.00 by 13 to arrive at an average weekly wage figure of $1,559.54 for the fourth period immediately prior to the claimant's work injury of October 28, 2004.

In order to complete my calculations, I have added together the claimant's average weekly wages for the second period ($306.23), third period ($368.15) and fourth period ($1,559.54) and arrived at a total of $2,233.92. I then divided this sum by three and arrived at an average weekly wage of $744.64 and a resulting total disability compensation rate of $496.67.

(FOF ¶ 39.) In its review on this issue, the Board quoted from Finding of Fact 39 that there is "no evidence in the record that the claimant has ever filed an amended tax return for the year 2004 recanting entitlement to any of the business expenses he declared" and concluded that the record supports the WCJ's determinations that "Claimant is bound by the actual return." (Board. Op. at 5 (quoting FOF ¶ 39).) Thus, the WCJ used the evidence that had been submitted by Claimant, his tax return, to determine the "total wages" for the relevant quarter at issue in order to calculate the AWW. (FOF ¶ 39.) The WCJ did not add Claimant's tax deductions for depreciation and home office business expense back to Claimant's commission income in order to arrive at his "total wages," which effectively would have increased Claimant's "total wages" by the amounts of these deductions. Because this Court has agreed that depreciation may be a proper business expense and has affirmed its subtraction to arrive at net business income for purposes of determining

"total wages," and because there is no contrary evidence to overcome the WCJ's determination that these were properly subtracted, we are not persuaded by Claimant's argument that *Nortim* supports the addition of the depreciation deductions to the total wage calculation in the case at bar. *Id.*, 615 A.2d at 876.

Claimant next contends that, even if the WCJ properly determined Claimant's net earnings to include the subtractions for the deductions in question, the deductions must be pro-rated for the relevant quarter. He argues that, in *Nortim*, the interest, legal and professional deductions were not permitted to be subtracted, despite Employer's argument to the contrary, because they were not actually paid in the relevant quarter.[6] Here, Claimant asserts that these deductions are based on annual deduction allowances, but he earned his commissions only in the fourth quarter. For this reason Claimant contends that only one-fourth of the deductions should be subtracted. However, the quarter in which Claimant earned his commissions is the quarter to which these deductions are attributable. It is undisputed that this is the only quarter in which Claimant worked as a commissioned driver and incurred these expenses. Therefore, there is no dispute about the relevant quarter to which the depreciation and business home use deductions were attributed, the quarter in which the commissions were earned.

Finally, Claimant maintains that it was not logical for the WCJ to refuse to "add back" these depreciation deductions in calculating net business income simply because Claimant never filed an amended tax return to show that he eliminated these

---

**6.** *Nortim* is focused upon whether the interest, legal, and professional expenses had been paid in the relevant quarter for purposes of determining net earnings; whereas, in the instant case, it was undisputed that Claim-

ant's depreciation and home business use deductions corresponded to the quarter in which he received his commission income. *Id.*, 615 A.2d at 876 n. 3.

deductions. Claimant asserts that accounting procedures for determining net profits are different than those used for purposes of the Internal Revenue Code in filing one's tax returns. However, this Court addressed the issue of business expenses in the context of computing "total wages" in *Philip Morris/Kraft Foods, Inc. v. Workmen's Compensation Appeal Board (Levan)*, 689 A.2d 986, 988–990 (Pa. Cmwlth.1997). That case involved a claimant who received from her employer a fixed amount for business expenses in addition to a fixed wage. Although this is somewhat different from the case at bar, in which Claimant received commissions that varied by job as opposed to a fixed wage, the discussion relating to the business expenses in *Philip Morris* is, nevertheless, instructive. This Court was required to decide how much of the fixed business expense payment, if any, should be included in the "total wages." *Id.* After determining that business expenses are not included in Section 309(e) because it "does not include as wages money paid out by the employer for the nebulous term 'business expenses,'" *id.* at 989, we examined how much of the claimant's fixed payment for business expenses was available for her personal use since only that amount could be included as wages. In making that determination, we instructed that this "can best be discovered by a review of [the claimant's] income tax returns." *Id.* at 990. The employee's supervisor testified that the claimant was given a business expense allowance "to reimburse all business expenses that could occur during the month of her employment, including car, phone, tolls, any incidentals that would come up." *Id.* at 989 n. 4. However, the WCJ did not accept this testimony and this Court stated that "we are left with only [the claimant's] testimony as to what the business expense allow-

ance was for, and this testimony is rather sketchy." *Id.*

Ultimately, in *Philip Morris*, we found that determining whether business expenses should be subtracted from net earnings "can best be discovered by a review of … income tax returns." *Id.* at 990. We believe that reviewing income tax returns is appropriate where those business expenses are paid out of a lump sum percentage commission, as in the case at bar, or are paid from a specific sum dedicated to that purpose, as in *Philip Morris*. Moreover, it is the WCJ who must determine the weight and the credibility of the evidence, including the tax returns. *Nortim*, 615 A.2d at 876 n. 2. In *Nortim*, the referee found that the claimant's testimony, records, and other documents were credible when addressing the issues related to the business expenses. *Id.* at 876. Likewise, the WCJ in the instant case considered the tax return and "all the evidence of record." (FOF ¶ 39.) The Claimant had the opportunity to present sufficient evidence that the deductions for business expenses on his tax return should not have been subtracted by the WCJ from his commission earnings in calculating his net income, but the WCJ did not find that he had done so.

Our role is to determine whether, upon consideration of the evidence as a whole, the findings have the requisite measure of support in the record. *Bethenergy Mines v. Workmen's Compensation Appeal Board (Skirpan)*, 531 Pa. 287, 293, 612 A.2d 434, 437 (1992). We are unable to disturb the WCJ's findings regarding the business depreciation and home office business expense deductions because there is the requisite measure of support for the WCJ's findings in the record, based on Claimant's tax return and the testimonial evidence.

For the foregoing reasons, we affirm the Order of the Board.

### ORDER

NOW, May 23, 2011, the Order of the Workers' Compensation Appeal Board in the above-captioned matter is hereby AFFIRMED.