IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh, :
                Petitioner :
   :
   v. : No. 1365 C.D. 2021
   :
Rosemary Borelli (Workers' :
Compensation Appeal Board), :
                Respondent : Submitted: February 10, 2023

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
JUDGE CEISLER                                FILED: July 20, 2023

The City of Pittsburgh (Employer) petitions this Court for review of the November 8, 2021 order of the Workers' Compensation Appeal Board (Board) affirming a Workers' Compensation Judge's (WCJ) decision denying Employer's Termination Petition, granting its Modification Petition, granting Rosemary Borelli's (Claimant) Claim Petition, and dismissing as moot Review Petitions filed by both Employer and Claimant. Employer argues that the WCJ erred by failing to assess Claimant's earning power pursuant to the standard set forth in *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 532 A.2d 374 (Pa. 1987), and by failing to issue a reasoned decision pursuant to Section 422(a) of the Workers' Compensation Act (Act),[1] 77 P.S. § 834. Upon review, we affirm the Board.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.1; 2501–2626.

## I. Background

Claimant was working for Employer as a police officer when she sustained an injury on June 28, 2016. Certified Record (C.R.), Item No. 53, Stipulation ¶ 1. At the time of the injury, Claimant was 59 years old, and had been employed in that position for 27 years. C.R., Item No. 51. Employer acknowledged the injury via a Notice of Compensation Payable (NCP), in which it described the injury as a thoracic and cervical strain. C.R., Item No. 53, Stipulation ¶ 2. Subsequently, Employer issued a notice of benefits pursuant to the statute commonly known as the Heart and Lung Act,[2] in which it expanded the injury description to include a strain of the left shoulder. *Id.* After a brief period of receiving Heart and Lung benefits, Claimant began receiving temporary total disability benefits on December 9, 2016. *Id.* ¶¶ 2-3.

On May 17, 2019, Claimant filed a Claim Petition requesting additional compensation due to a scar on the back of her neck, caused by surgery allegedly necessitated by the June 28, 2016 injury. *See* C.R., Item No. 2. On June 6, 2019, Employer filed a Termination Petition, in which it alleged that Claimant was found to be fully recovered from her neck and thoracic spine injuries, and that she was entitled to ongoing wage loss benefits for her shoulder injury only. *See* C.R., Item No. 6. Employer also filed a Modification Petition on February 27, 2020. *See* C.R., Item No. 11. Therein, Employer alleged that Claimant was partially disabled, and that a recent Earning Power Assessment (EPA) found Claimant to be physically able and qualified to perform several jobs. *Id.* Despite being informed of the availability of those jobs, Employer alleged that Claimant failed to follow through on the

---

[2] Act of June 28, 1935, P.L. 477, *as amended*, 53 P.S. §§ 637-638.

referrals in good faith. *Id.* Employer therefore requested a reduction in Claimant's benefits of an unspecified amount. *Id.*

The parties also submitted several Review Petitions.[3] Employer's first Review Petition, filed on June 6, 2019, disputed its liability for continued treatment of Claimant's neck and thoracic spine injuries, claiming that Claimant was fully recovered from those injuries. *See* C.R., Item No. 5. In a second Review Petition, filed on February 27, 2020, Employer argued that Claimant's temporary total disability benefits should be changed to temporary partial disability benefits as the result of a December 3, 2019 impairment rating evaluation conducted by Dr. Richard Kaplan. *See* C.R., Item No. 14. Claimant's Review Petitions, filed on August 11, 2020, requested an expansion of the injury description listed on the NCP to include "post cervical foraminotomy at C5-C6 through C7-T1 and post left rotator cuff repair." *See* C.R., Items Nos. 17-18. The parties subsequently stipulated that Claimant had an impairment rating evaluation of 22%, and that the injury description should be amended as requested by Claimant. *See* C.R. Item No. 53; *see also* C.R., Item No. 20, Answer.

The Claim, Termination, Modification, and Review Petitions were consolidated by a WCJ. Hearings on the Petitions were held on June 20, 2019;

---

[3] Section 423 of the Act provides that a WCJ "may, at any time, review and modify or set aside a notice of compensation payable and an original or supplemental agreement or upon petition filed by either party with the [Department of Labor and Industry (Department)], or in the course of the proceedings under any petition pending before such [WCJ], if it be proved that such notice of compensation payable or agreement was in any material respect incorrect." 77 P.S. § 771. A Petition to Review Compensation Benefits is the appropriate mechanism to secure modification of the injury description listed in an NCP. *Cinram Mfg. v. Workers' Comp. Appeal Bd. (Hill)*, 975 A.2d 577, 581 (Pa. 2009). It is also appropriate when an aggrieved party seeks to establish that the compensation calculated in the NCP was materially incorrect. *Reifsnyder v. Workers' Comp. Appeal Bd. (Dana Corp.)*, 883 A.2d 537, 540 (Pa. 2005).

September 12, 2019; January 21, 2020; April 14, 2020; June 9, 2020; and August 13, 2020. *See* C.R., Items Nos. 29-34. Claimant offered her own fact testimony, as well as the expert testimony of Dr. John William Bookwalter, III, her treating neurosurgeon, and James Primm, a vocational expert. Employer offered the expert testimony of Dr. Thomas Kramer, an orthopedic surgeon who conducted an independent medical examination (IME) of Claimant, as well as Roy Patton, a vocational expert who conducted the EPA of Claimant.

**A. Claimant's Evidence**

Claimant, a resident of the South Hills area of Pittsburgh, began working for Employer as a patrol officer on April 17, 1989. C.R., Item No. 29, June 18, 2019 Hearing, Notes of Testimony (N.T.) at 9-10. On the evening of June 28, 2016, while on duty, Claimant tried to intervene in a physical altercation between a young woman and her mother when the young woman grabbed Claimant's left arm and "twisted [it] all the way behind [Claimant's] back." *Id.* at 10. Claimant described the pain as follows: "My shoulder[,] and then I had like this wicked thing like somebody was putting a knife in my neck. And I had this jabbing pain in my back[,] and it just didn't go away for a long time." *Id.* at 12. Claimant, who is left-handed, recalled numbness and tingling in her left arm that persisted long after the incident. *Id.*

In consultation with Dr. Bookwalter, Claimant tried a variety of conservative treatments for her neck symptoms, such as physical therapy. *Id.* at 12. When the pain and numbness persisted, Dr. Bookwalter performed neck surgery on Claimant December 9, 2016. The surgery involved making an incision along the back of Claimant's neck to take the pressure off the nerve root. *Id.* at 13. Claimant underwent further surgery on April 28, 2017, in order to address her shoulder

4

injuries. *Id.* at 14-15. Despite the surgeries and an ongoing physical therapy regimen, Claimant testified that she continued to feel pain and discomfort in her neck, which radiated outward into her left shoulder and arm. *Id.* at 15-16. Claimant explained that she was capable of performing basic household chores with her left arm but, due to periodic pain or numbness, she was not always able to complete her tasks. *Id.* at 23-24. To accommodate her injuries, Employer reassigned Claimant to light-duty work, but the continued numbness in her left arm inhibited her ability to type. *Id.* at 26. Claimant's last day with Employer was May 6, 2019, when a disability pension took effect.[4] *Id.* at 25.

On December 4, 2019, Claimant had a meeting with Mr. Patton, Employer's vocational expert, during which she answered extensive questions about her background, including her work history and education. C.R., Item No. 32, April 14, 2020 Hearing, N.T. at 13-14. Subsequently, Mr. Patton notified Claimant of five open and available jobs which she would be qualified and able to perform. *Id.* at 14. Claimant applied for all five positions after Mr. Patton sent her the postings, but she was not hired for any of them. *Id.* at 14-20.

Claimant acknowledged that on at least one job application, she specified that she would not be willing to work full time or on any weekends or holidays. *Id.* at 22. Additionally, Claimant acknowledged that, during an interview for a sales position, she told the interviewer that she "wasn't very good at sales." *Id.* at 20. On another application, for a position that would pay $11.25 an hour, Claimant acknowledged stating that she desired $25.00 an hour. *Id.* at 23. When asked whether she thought that providing such information negatively impacted the likelihood of her being

---

[4] It is unclear from the record whether Claimant ended her light-duty assignment and accepted the disability pension of her own accord, or at Employer's direction.

5

hired, Claimant responded: "I'm not sure. I haven't filled out a job application in 30 years." *Id.* at 22-23. Claimant also indicated that she did not feel capable of performing the jobs that Mr. Patton referred to her "[w]ithout some difficulty." *Id.* at 24. Claimant remained open to the prospect of finding work through Mr. Patton's leads, as long as he "could find something that would suit [her] life." *Id.* at 27. Asked to clarify, Claimant explained she was simply unsure of whether returning to the workforce full time "would work." *Id.* "I just can't imagine doing it, physically or mentally," Claimant added. *Id.*

In his deposition, neurosurgeon Dr. Bookwalter, stated that his first examination of Claimant occurred on September 1, 2016. C.R., Item No. 37, Bookwalter Deposition (Dep.), 12/9/2019, at 7. In Dr. Bookwalter's view, the examination revealed "diminished range of motion of [Claimant's] neck with spasm," as well as weakness in the triceps and forearm muscles. *Id.* at 9. Dr. Bookwalter also personally reviewed the results of an electromyography (EMG) conducted by Dr. Jeffrey Lemberg on June 13, 2016, which "suggest[ed] the possibility of C-7 and C-8 radiculopathies," as well as "findings consistent with carpal tunnel syndrome." *Id.* at 10.

When a regimen of steroidal and non-steroidal medicines failed to relieve Claimant's neck and thoracic spine issues, Dr. Bookwalter performed a series of foraminotomies, which he described as operations that take "the pressure off the nerve root." *Id.* at 11-12. At the time of his December 9, 2019 deposition, Dr. Bookwalter continued to meet with Claimant on a monthly basis. *Id.* at 11. Following the surgery, Dr. Bookwalter observed that Claimant's arm symptoms had improved, but that she also continued to experience "incisional discomfort" from the surgery, "some residual numbness in the fingers," and "discomfort and pain related

to her primary shoulder problem." *Id.* at 14. A new EMG by Dr. Lemberg, conducted on August 26, 2019, indicated "acute to subacute left-sided C[-]8 radiculopathy," from which Claimant "has not fully recovered." *Id.* at 22. Dr. Bookwalter concluded that Claimant was undergoing a "clearly documented . . . radiculopathic process," related to her June 28, 2016 work injury. *Id.*

Following an April 29, 2019 examination, Dr. Bookwalter completed a work restriction form for Claimant. *Id.* at 19. Due to her persistent symptoms, Dr. Bookwalter determined that Claimant should only perform "sedentary duty," which he characterized as "lifting ten pounds or less on a frequent basis," and occasional sitting, standing, or walking for up to six hours daily, "but not solidly." *Id*. at 19. In addition, Claimant was to avoid any overhead movement of her arms due to the pain that would result. *Id.* Dr. Bookwalter clarified that he was not offering a medical opinion of Claimant's shoulder impairment, which he did not treat. *Id.* at 20. However, he opined that continued treatment of Claimant's shoulder would require the same work restrictions as those he had imposed. *Id.*

On cross-examination, Dr. Bookwalter recalled conducting a functional capacity evaluation (FCE) of Claimant on June 21, 2018. *Id.* at 46. Dr. Bookwalter acknowledged authoring a note following the FCE, in which he concluded that Claimant was capable of working in a light-duty capacity. *Id.* However, Dr. Bookwalter maintained that, although Claimant may intermittently perform light-duty work, he did not advise that Claimant could work full time. *Id.* at 47. Assuming a 40-hour work week, Dr. Bookwalter stated his "general feeling, having known [Claimant] over a period of time," was that Claimant was unlikely ever to function at a level higher than sedentary. *Id.* at 46.

7

Mr. Primm, a certified vocational expert, issued a report at Claimant's request on March 24, 2020. *See* C.R., Item No. 39. Therein, Mr. Primm stated that, based on Claimant's "age, education, residual productive skill, geographic area[,] and her physical capabilities as outlined by Dr. Bookwalter," there was no reason to conclude that Claimant had any earning power. *Id.* at 5. Mr. Primm explained that the jobs available to Claimant were limited not just by the effects of her injury, but by the few skills that she could transfer from her many years as a police officer. *Id.* at 3. Thus, while acknowledging that Claimant was not totally disabled, Mr. Primm opined that none of the positions found by Mr. Patton were either vocationally or physically appropriate employment. *Id.* at 5. Mr. Primm also testified at a hearing before the WCJ. *See* C.R., Item No. 34, 8/13/2020 Hearing. In his testimony, Mr. Primm reiterated that he relied "solely" on Dr. Bookwalter's report in determining the physical limits on Claimant's work capabilities. *Id.*, Notes of Testimony (N.T.) at 34. Mr. Primm also acknowledged that, were the WCJ to accept Dr. Kramer's conclusions (which are summarized below) over Dr. Bookwalter's, at least one of the available positions would be "compatible with [Claimant's] employment history and residual productive skill." *Id.*

**B. Employer's Evidence**

Dr. Kramer testified regarding an IME that he performed on Claimant on November 8, 2018. C.R., Item No. 48, Kramer Dep., 10/3/2019, at 7. In formulating his opinion, Dr. Kramer also relied on Claimant's medical and employment records. *Id*. at 8-10. At the beginning of the examination, Dr. Kramer recalled that Claimant presented with pain in her neck and mid-back, which she characterized as a 5 on a 10-point scale. *Id.* at 10. Claimant also complained of numbness and tingling in her left arm. *Id.* Examining Claimant's neck and arms, Dr. Kramer determined that

8

Claimant's voluntary range of motion and strength levels were "normal." *Id.* at 12-13. Dr. Kramer's overall impression was that Claimant had sustained a cervical and thoracic strain, a left shoulder sprain, and cervical radiculopathy due to her work injury. *Id.* While some symptoms of the shoulder injury were still present, Dr. Kramer concluded that she had fully recovered from the cervical and thoracic injuries. *Id.* at 20-21. Dr. Kramer did not believe that the August 26, 2019 EMG was evidence of ongoing radiculopathy, because Claimant made no complaints of pain in the "upper left extremity," which any ongoing radiculopathy would produce. *Id.* at 33. Asked if the August 26, 2019 EMG swayed his opinion at all, Dr. Kramer replied that, to the contrary, it confirmed his opinion that Claimant had fully recovered from the cervical and thoracic injuries. *Id.* at 34.

Due to the persistent pain and weakness in Claimant's shoulder, Dr. Kramer opined that Claimant's employment should be permanently limited to "a light-duty capacity." *Id.* at 30. Dr. Kramer also disagreed with the conclusion that Claimant should be restricted to sedentary work, citing to Dr. Bookwalter's written report, which suggested that Claimant was capable some light-duty activities. *Id.* at 32. Dr. Kramer expressed skepticism of the accuracy of the FCE performed by Dr. Bookwalter, noting that the results indicated "nonconsistent efforts" by Claimant in performing certain tasks during the examination. *Id.* at 32. Because Claimant's subjective pain complaints could not be fully corroborated by objective findings, Dr. Kramer concluded that Dr. Bookwalter's release of Claimant to sedentary to light duty "would most likely represent an underestimation of . . . what she truly can perform." *Id.* at 39.

Testifying at a hearing before the WCJ, Mr. Patton stated that he was a certified rehabilitation counselor and vocational expert. C.R., Item No. 33, 6/9/2020

9

Hearing, N.T. at 12. Mr. Patton met with Claimant and her attorney on December 4, 2019, to conduct an EPA to allow Mr. Patton to determine Claimant's work capabilities and find appropriate job openings. *Id.* at 22. After gathering Claimant's medical and work history, Mr. Patton conducted a search of open and available jobs for which, in his view, Claimant was "physically and vocationally suited." *Id.* at 22. Mr. Patton broadened the search to include light-duty as well as sedentary positions, reasoning that Dr. Bookwalter's more conservative work restrictions were not for "classic sedentary duty," but "a mixture of sedentary to light [duty]." *Id.* at 62. Under Dr. Bookwalter's restrictions, Mr. Patton reasoned that Claimant would be able to perform tasks involving sitting, standing, and walking, which are characteristic of light-duty positions, so long as she could "change position as necessary." *Id.*

Over the five weeks following his initial meeting with Claimant, Mr. Patton found five open and available jobs that he believed were appropriate. They are as follows:

- On December 16, 2019, Mr. Patton informed Claimant of an opening for a security officer with a private security company. *Id.* at 40. Upon hiring, the employee would be stationed at Shaler High School, in the northern suburbs of Pittsburgh. *Id.* at 41. It would have been a full-time position paying $10.50 per hour, or $420.00 weekly. *Id.* at 40. Mr. Patton explained that it was a "light[-]duty . . . security officer position with no police powers," and "no physical contact with any individuals." *Id.* While there would be "a lot of standing and walking intermittently," Mr. Patton further explained, there would also be "no lifting over five to ten pounds." *Id.*

10

- On January 7, 2020, Mr. Patton informed Claimant that Rivers Casino in downtown Pittsburgh was looking for someone to work as a "surveillance agent." *Id.* at 42. Mr. Patton characterized it as "a sedentary[-]duty office job," for which the employee would be paid $15.00 per hour, or $600.00 weekly. *Id.* at 42-43.

- Also on January 7, 2020, Mr. Patton notified Claimant of an open teller position at a Dollar Bank branch southwest of downtown Pittsburgh. *Id.* at 43. For the position, Dollar Bank offered $12.00 per hour, or $480.00 weekly. *Id.*

- On January 8, 2020, Mr. Patton informed Claimant that the Pennsylvania Higher Education Assistance Agency (PHEAA) had an opening for an entry-level call center representative at their call center in Green Tree, a Pittsburgh suburb. *Id.* at 44. It was a full-time position, for which the employee would be paid $15.50 per hour, or $620.00 weekly. *Id.* Mr. Patton characterized it as "a sedentary office position." *Id.*

- Also on January 8, 2020, Mr. Patton notified Claimant of an open teller position at a Farmer's National Bank of Emlenton branch in Aspinwall, another suburb of Pittsburgh. *Id.* The employee would work full time, and earn $11.25 per hour, or $450.00 weekly. *Id.*

As part of the EPA process, Mr. Patton visited each prospective worksite to confirm that the job duties were within Claimant's capabilities. *Id.* at 45. After visiting the worksites, Mr. Patton submitted reports on each position to Dr. Kramer for a formal opinion on whether Claimant was physically capable of the job duties. *Id.* at 46. Dr. Kramer gave his approval for all five positions. *Id.* Meanwhile, Claimant submitted applications for all five, and Mr. Patton received copies of each

completed application. *Id.* at 48. Ultimately, Mr. Patton determined Claimant's earning capacity to be $514.00 weekly, based on the average of the weekly wages offered for all five available positions. *Id.* at 58-59.

When prompted to review his copy of the application to Rivers Casino, Mr. Patton noted that Claimant stated her refusal to work in the evening, on weekends, or on holidays. *Id.* at 48-49. Reviewing the application to Capital Asset Management, Mr. Patton noted that Claimant limited her availability to just 20 hours per week. *Id.* at 52. Claimant also stated on the application that she desired to be paid $20.00 per hour. *Id.* Employer's counsel asked Mr. Patton, based on his experience, what impact it has on a hiring decision if an applicant requests a wage that is nearly twice the wage being offered. Mr. Patton responded that the applicant is "automatically eliminated from consideration." *Id.* at 53. Mr. Patton further opined that an applicant's inflexibility on working evenings or weekends also negatively impacts an applicant's likelihood of being hired. *Id.* at 53.

On cross-examination, Claimant's counsel asked Mr. Patton to identify where in the Rivers Casino job posting the $15.00 hourly wage was mentioned. *Id.* at 80. Reviewing the posting, Mr. Patton acknowledged that he did not see any specification of wages. *See* C.R., Item No. 51. Mr. Patton further acknowledged that the job posting specified "a thorough understanding" of Pennsylvania gaming regulations, and that "some licensing" could be required after hiring. *Id.* at 81. Claimant's counsel asked Mr. Patton if he was aware of what skills or knowledge would be required in order to obtain that licensing. *Id.* Mr. Patton responded that the requisite knowledge or skills would be included in the new employee's on-the-job training. *Id.* at 81-82.

12

## C. The WCJ's Decision

In a December 21, 2020 decision, the WCJ credited Claimant's testimony in full. C.R., Item No. 22, WCJ Decision, Finding of Fact (F.F.) No. 19. The WCJ explained that Claimant "was not shaken of her account of continuing pain and impairment," even when faced with "meticulous, exacting, and expert cross-examination." *Id.* Claimant's testimony was also credited because of its consistency with Dr. Bookwalter's testimony, which the WCJ also credited "in its entirety." *Id.* By contrast, the WCJ was not persuaded by the testimony of Dr. Kramer that Claimant was fully recovered from her cervical and thoracic spine injuries. *Id.* In particular, the WCJ rejected Dr. Kramer's opinion that the August 26, 2019 EMG strengthened his opinion of full recovery, a statement which the WCJ said "did not make sense." *Id.*

While accepting Dr. Bookwalter's testimony as fact, the WCJ also credited Dr. Kramer's opinion that Claimant was fit for light-duty work. *Id.*, F.F. No. 20. Dr. Bookwalter failed to persuade the WCJ that Claimant was only fit for sedentary duties. *Id.* The WCJ also credited Mr. Patton's testimony over Mr. Primm's, and concluded that Claimant was fit to work as a security officer at the proposed high school. *Id.* Accordingly, the WCJ concluded that Claimant had "restored her earning power with such a job in the amount of $420.00 per week." *Id.* The WCJ declined to consider the other positions found by Mr. Patton, which the WCJ found to be "too speculative as to a physical and vocational fit." *Id.* The WCJ determined that these were "implausible" employment options. *Id.*

As a result of his factual findings, the WCJ denied Employer's Termination Petition but granted its Modification Petition, and reduced Claimant's benefits by $420.00. *Id.*, Order. The WCJ also amended the injury description to include "post[-

]cervical foraminotomy at C5-C6 through C7-T1, and post[-]left rotator cuff repair." *Id.* Based on his personal observation of the scar on Claimant's neck, the WCJ also granted her Claim Petition, entitling her to 20 weeks of specific loss benefits, effective June 20, 2019. *Id.* In light of the stipulation and agreement between the parties, the Review Petitions were dismissed as moot. *Id.*

Employer appealed to the Board, which modified the award of specific loss benefits to begin on December 16, 2019, when Claimant no longer received temporary benefits, rather than June 20, 2019, the Claim Petition's effective date. C.R., Item No. 27, Board Opinion (Op.) at 18. The Board otherwise affirmed the WCJ's grant of the Modification and Claim Petitions, dismissal of the Termination Petition, and all other aspects of the WCJ's decision. *Id.* at 20. This appeal followed.[5]

## II. Issues

Employer argues that the Board erred in affirming the WCJ, because the WCJ committed an error of law when he failed to evaluate Employer's Modification Petition using the standard set forth in *Kachinski*, 532 A.2d at 374. In addition, Employer argues that the WCJ erred as a matter of law by failing to explain why he disregarded Mr. Patton's testimony that Claimant was physically and vocationally able to perform all five of the job openings referred to her.

---

[5] This Court's review is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether constitutional rights were violated, or whether errors of law were committed. *Borough of Heidelberg v. Workers' Comp. Appeal Bd. (Selva)*, 928 A.2d 1006, 1009 (Pa. 2007). Where the issue presented involves a question of law, our standard of review is *de novo* and our scope of review is plenary. *Id.*

14

### III. Discussion

### A. The Applicability of the *Kachinski* Test

Before it was amended in 1996, the Act did not delineate standards for employers seeking modification or suspension of wage loss benefits. *Riddle v. Workers' Comp. Appeal Bd. (Allegheny City Elec., Inc.)*, 981 A.2d 1288, 1292 (Pa. 2009). When an employer sought to modify benefits based on the assertion that an employee had regained some or all capability of gainful employment, its petition was evaluated according to a four-part test developed by the Supreme Court in *Kachinski*. Specifically, the employer was required to produce evidence that (1) the claimant's medical condition had changed, and (2) the employer had referred the employee to an open job or jobs fitting the occupational category in which the claimant was cleared to work. 532 A.2d at 380. The burden then shifted to the claimant to show (3) that he had "in good faith followed through on the job referrals." *Id.* If no job actually resulted in spite of the claimant's good-faith effort, then (4) his benefits would continue without modification. *Id.*

Section 4 of the Act of June 24, 1996, P.L. 350, commonly referred to as Act 57, replaced the *Kachinski* test with the criteria set forth in what is now Section 306(b) of the Act, 77 P.S. § 512. Under the current law, an employer who files a petition to modify a claimant's benefits from total to partial may succeed if the employer establishes that the disabled claimant has "earning power." *Rebeor v. Workers' Comp. Appeal Bd. (Eckerd)*, 976 A.2d 655, 658 (Pa. Cmwlth. 2009). Section 306(b)(2) provides that earning power may be determined through "expert opinion evidence which includes job listings with agencies of the [Department], private job placement agencies and advertisements in the usual employment area." 77 P.S. § 512(2). Partial disability will apply where the employee can perform his

previous work or, "considering the employe[e]'s residual productive skill, education, age and work experience, engage in any other kind of substantial gainful employment which exists in the usual employment area in which the employe[e] lives within this Commonwealth." *Id.* If the employee is found partially disabled, Section 306(b)(1) provides that the WCJ shall reduce his wage loss benefits to a figure equal to "sixty-six and two-thirds per centum of the difference between the [pre-injury] wages of the injured employe[e] . . . and the earning power of the employe[e] thereafter." 77 P.S. § 512(1).

Instantly, Employer alleges that Claimant failed to follow through in good faith on the five job openings that Mr. Patton found for her. According to Employer, Claimant's stated refusal to work at any time but weekday daylight shifts, and her insistence on a much higher starting wage for the high school security position than what was offered, "suggest possible sabotage and a bad faith attempt to secure employment with the prospective employers." Employer's Brief (Br.) at 38. Employer argues that the WCJ should therefore "have provided an analysis and rendered a decision under the *Kachinski* standard" in addition to the standard set forth in Section 306(b)(2). Employer's Br. at 42.

Employer argues that the question of whether Claimant had applied for available positions in good faith is important "if there would be subsequent litigation." *Id.* In support, Employer cites this Court's decision in *J.A. Jones Construction Company v. Workers' Compensation Appeal Board (Nelson)*, 784 A.2d 280 (Pa. Cmwlth. 2001). In that case, a claimant received total disability benefits following a 1992 workplace injury. *Id.* In 1995, a WCJ granted a petition to modify the claimant's benefits from total to partial, finding that the claimant had failed to act in good faith on a light-duty employment opportunity that the employer

16

had arranged for him. *Id.* The claimant's condition subsequently worsened, but improved again before his reinstatement petition could be adjudicated. *Id.* at 281. A WCJ granted total disability benefits for the brief period of the claimant's worsened condition, but only partial disability benefits from that point forward, explaining that once "it has been established that work was available to the claimant and the claimant refused such work in bad faith, the fact of job availability does not have to be reestablished after any intervening period of temporary total disability." *Id.* We agreed, based on expert testimony that the claimant was once again "able to perform the job previously offered and rejected." *Id.* at 283. Thus, the employer was "not required to again establish that a new job [was] available." *Id.*

Employer's arguments are unavailing. In *J.A. Jones*, the claimant sustained his work injury several years before the passage of Act 57, which means that his wage loss benefits were properly modified pursuant to the *Kachinski* standard. Here, as Claimant was injured 20 years after Act 57's passage, Employer's Modify Petition was evaluated under Section 306(b)(2). In enacting the latter provision, the legislature "lowered the *Kachinski* burden of proof by allowing an employer to obtain modification or suspension of benefits on evidence of earning power proved through expert testimony rather than by providing evidence that the claimant had obtained employment." *Riddle*, 981 A.2d 1292 n.8. Thus, the employer's burden is merely to establish the availability of jobs, not whether the claimant had actually pursued them in good faith.

Here, the WCJ credited Mr. Patton's expert opinion testimony that jobs within Claimant's physical and vocational capabilities were available in Claimant's local area, and modified Claimant's benefits accordingly. Contrary to Employer's arguments, the WCJ is not required to determine whether Claimant followed through

17

in good faith on the referrals, which is a question that became largely obsolete following the passage of Act 57. Under Section 306(b)(2), it was not even necessary in the first place for Employer to investigate whether Claimant had applied for the positions found by Mr. Patton. As the WCJ aptly noted, Mr. Patton's "approach . . . took the form of some level of attempted job placement, though this is not the employer's burden under the law." C.R., Item No. 22, WCJ Decision, F.F. No. 14. Thus, we see no error in the WCJ's use of Section 306(b)(2), rather than the *Kachinski* test, to evaluate Employer's Modify Petition.

### B. The Reasoned Decision Requirement

Next, Employer argues that the WCJ did not issue a reasoned decision, as his decision "failed to provide any meaningful analysis of the jobs found open and available by Mr. Patton that he felt were within the Claimant's physical and vocational capabilities." Employer's Br. at 44.

Section 422(a) provides, in pertinent part, that the parties to an adjudicatory proceeding "are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." 77 P.S. § 834. A decision is "reasoned" for purposes of Section 422(a) if it allows for adequate review by the Board without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards." *Daniels v. Workers' Comp. Appeal Bd. (Tristate Transp.)*, 828 A.2d 1043, 1052 (Pa. 2003).

Instantly, Employer argues that there "should not be any dispute as to the Rivers Casino position being both physically and vocationally appropriate for the Claimant," given that the WCJ credited Mr. Patton's testimony. *Id.* at 48. According

18

to Employer, the WCJ should have offered some basis for his determination that the position was "too speculative as to a physical and vocational fit." C.R., Item No. 22, WCJ Decision, F.F. No. 20. Employer explains that the WCJ should have further reduced Claimant's wage loss benefits in light of the other available positions, two of which were more lucrative than the Shaler High School security officer position. Because the WCJ did not include an explanation of that part of his decision, Employer argues, the decision fell short of the standard required by Section 422(a).

Employer's arguments are again unpersuasive. When an employer seeks to establish a claimant's earning power through expert testimony on jobs open and available to the claimant, the employer "must still convince the fact-finder that positions within the injured worker's residual capacity are actually available." *Allied Prods. & Servs. v. Workers' Comp. Appeal Bd. (Click)*, 823 A.2d 284, 287 (Pa. Cmwlth. 2003).[6] As the ultimate finder of fact, the WCJ has exclusive province over questions of evidentiary weight, and is free to accept or reject the testimony of any witness, in whole or in part. *Williams v. Workers' Comp. Appeal Bd. (USX Corp.– Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004). The WCJ is not required to accept even uncontradicted testimony. *Capasso v. Workers' Comp. Appeal Bd. (RACS Assocs., Inc.)*, 851 A.2d 997, 1002 (Pa. Cmwlth. 2004). Thus, the determination of whether all or any of the positions described by Mr. Patton were "actually available" lies firmly within the WCJ's discretion.

---

[6] In *Allied Products*, a WCJ rejected the findings of an EPA, which listed six jobs that were allegedly appropriate for an injured claimant. 823 A.2d at 286. The employer appealed to the Board, which affirmed on the basis that "the credibility of [employer's] vocational expert was solely in the WCJ's discretion." *Id.* at 287. We agreed, simply noting that since "the WCJ determined [the employer's vocational expert's] testimony was not credible, [the e]mployer failed to meet its burden, and the WCJ properly denied its modification petition." *Id.* at 288.

Significantly, both vocational experts testified at hearings before the WCJ, rather than in depositions. Our Supreme Court has held that, in cases where the WCJ "has had the advantage of seeing the witnesses testify and assessing their demeanor, a mere conclusion as to which witness was deemed credible, in the absence of some special circumstance, could be sufficient to render the decision adequately 'reasoned.'" *Daniels*, 828 A.2d at 1053. Had Employer merely supplied the WCJ with a deposition transcript, it is possible that a reviewing body would need a more thorough explanation of why the WCJ rejected one part of Mr. Patton's testimony. *See id.* (explaining that, "absent the circumstance where a credibility assessment may be said to have been tied to the inherently subjective circumstance of witness demeanor, some articulation of the actual objective basis for the credibility determination must be offered for the decision to be a 'reasoned' one which facilitates effective appellate review"). In this instance, however, the WCJ was able to make an on-the-spot determination of whether Mr. Patton's testimony regarding the Rivers Casino position was credible. Since making such determinations is the quintessential role of the WCJ, we decline to disturb his conclusions.

## IV. Conclusion

The WCJ had no duty to evaluate Employer's Modification Petition pursuant to the *Kachinski* standard, but only in accordance with Section 306(b)(2) of the Act. Furthermore, the WCJ was within his discretion to accept or reject Mr. Patton's testimony that job positions other than the Shaler High School security officer position were open and available to Claimant. The WCJ's explanation of that

20

determination was adequate for the purpose of issuing a reasoned decision pursuant to Section 422(a) of the Act. Accordingly, we affirm the Board's order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh,                          :
                    Petitioner               :
                                             :
        v.                                   :   No. 1365 C.D. 2021
                                             :
Rosemary Borelli (Workers'                   :
Compensation Appeal Board),                  :
                    Respondent               :

# **O R D E R**

AND NOW, this 20th day of July, 2023, the order of the Workers' Compensation Appeal Board, dated November 8, 2021, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge